*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0452p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

IVAN NICHOLAS ROBERT,

    *Petitioner-Appellant,*

    *v.*

    No. 06-3889

GAYLE M. TESSON,

    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00333—Michael H. Watson, District Judge.

Argued: October 25, 2007

Decided and Filed: November 14, 2007

Before: KEITH and CLAY, Circuit Judges; STEEH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Albert G. Lin, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellant. Gregory Louis Adams, CROSWELL & ADAMS CO., Cincinnati, Ohio, for Appellee. **ON BRIEF:** Albert G. Lin, Tyler B. Pensyl, Kenneth J. Rubin, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, Darrell A. H. Miller, UNIVERSITY OF CINCINNATI, COLLEGE OF LAW, Cincinnati, Ohio, for Appellant. Gregory Louis Adams, CROSWELL & ADAMS CO., Cincinnati, Ohio, for Appellee.

---

## OPINION

---

    CLAY, Circuit Judge. Petitioner Ivan Nicholas Robert appeals a decision in favor of his estranged wife, Respondent Gayle M. Tesson, denying return of their twin sons to Plaintiff's home country of France. Petitioner alleges that Respondent illegally abducted the twins to the United States, and that the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") requires that they be returned to France. For the reasons that follow, we hold that the district court applied an incorrect legal standard in determining that the children were habitual residents of the United States at the time of the alleged abduction. Nevertheless, because we also believe that applying the district court's findings of fact to the proper legal standard will not

---

[*] The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

alter the outcome of that court's decision, we **AFFIRM** the district court's decision denying the petition for return of children.

## STATEMENT OF FACTS

### A.    Substantive Facts

Petitioner Ivan Nicholas Robert, a citizen of France, met Respondent Gayle M. Tesson in 1994.  At the time, Petitioner was training to be a helicopter pilot in Houston, Texas, while Respondent was practicing anesthesiology in the same city.  Although the parties resided in the United States at this time, Petitioner purchased a laundromat in France in 1995 using money loaned to him by Respondent.  Respondent also loaned Petitioner's mother the money to purchase an interest in the laundromat.  After Respondent finalized divorce proceedings with her first husband, the parties married on January 6, 1996 in France.  Petitioner received permanent resident status in the United States shortly thereafter.

On May 22, 1997, the couple's twin boys, Thomas J. Robert and Alexis E. Robert, were born in Houston.  Respondent continued practicing medicine until a couple months before she gave birth. While she briefly attempted to return to a part-time medical practice shortly thereafter, she soon decided to stay at home with the boys, a decision she blames on Petitioner's inability to care for the children.

In the Spring of 1998, the parties formed a French company called SCI-TAGIR[1] and purchased a lot in Cabris, France.  Petitioner alleges that the lot was purchased in order to build a family home in France.  Respondent claims it was purchased as an investment.

In June 1998, the parties terminated their lease in Houston and put their belongings in storage with instructions to ship them to Nice, France upon future notice.  During the next several months the parties lived in several locations throughout the United States.  For much of this time, the family lived apart, as Petitioner unsuccessfully searched for jobs in the Northwest United States while Respondent and the twins stayed with her sister in Virginia.  During this time, Petitioner also returned to Houston long enough to sell the family car.

### 1.    December 1998-July 1999:  The Twins Live in France

In December of 1998, the entire family moved to France.  Accompanying them was "Patches," the family dog which Respondent obtained while she was an emergency room intern in 1987.  The family rented an apartment near the lot they had purchased in Cabris, and Respondent stayed at home with the twins while Petitioner worked at the laundromat**.**  According to Respondent, this was a stressful and unhappy time for her.  She described her husband as highly critical of her and frequently absent.  In July 1999, the parties decided their marriage was not working, and separated.  Patches remained in France with Petitioner until his death in 2000.

---

[1]The letters "TAGIR" are derived from the first and last names of the parties and their children: "Thomas," "Alexis," "Gayle," "Ivan" and "Robert."  Petitioner and Respondent were the sole interest holders in SCI-TAGIR.

## 2.       July 1999-September 2001:  The Twins Live in the United States

Respondent returned to Baton Rouge with the twins to live with her mother, where she eventually resumed the practice of anesthesiology on a *locum tenens* basis.[2]   In June 2000, Respondent rented an apartment in Baton Rouge, listing her marital status as "separated" on the rental application.  She took no formal steps to end the marriage.  While in Louisiana, the twins attended pre-school and a summer program from Fall 1999 through Summer 2001.

While Respondent and the twins were living in Baton Rouge, Petitioner contacted Respondent in Fall of 1999.  He told her that he had found a house, named "Mas Verdoline," in France.  Petitioner told Respondent that he would like to try and make their marriage work, and that he felt Mas Verdoline would be a good place for them to settle and live as a family.  Even though the house required significant structural repairs, had no heat, running water or electricity, and was located in an area where this kind of rustic living was common, SCI-TAGIR purchased the house in December of 1999, and Petitioner began a slow process of renovating the home.

These renovations were financed, at least in part, by a credit card that Respondent provided to Petitioner.  Respondent also participated in many of the decisions concerning these renovations, including the decision to install solar panels and purchase an expensive refrigerator manufactured specifically for solar homes.  Nevertheless, the parties disagree on the purpose of Mas Verdoline.  Petitioner maintains that they agreed that Respondent would continue to earn money in the United States in order to finance a permanent family home in France, while Respondent insists that the home was never intended to be more than a temporary residence before the twins began permanent schooling in the United States.

In May of 2000, the parties decided to "reunite."  (J.A. 83.)  They agreed that Respondent and the twins would return to France in September 2001, shortly after her *locum tenens* contract expired, and that the boys would be enrolled in a pre-school program in France.  Respondent testified that she was seeking a reconciliation with her husband because "everyone deserves a second chance."  (*Id.*)  Respondent and the boys also made two brief trips to France in March and November of 2000.

## 3.       September 2001-December 2002:  The Twins Live in France

In September 2001, Respondent and the twins traveled to France.  Because the repairs on Mas Verdoline were still uncomplete, the family spent most of this time living in a rental in Cabris.  During this time, the boys attended French school and became fluent in French.  Nevertheless, English remained the language which the family spoke at home.

The marriage soon grew strained again, however, and Respondent began looking for another *locum tenes* position in the United States.  In July of 2002, she left for just such a position in Denver, Colorado.  Because her new job was a demanding position at a level one trauma hospital, the parties agreed that the twins would remain behind in France with their father.  From July until November 2002, Petitioner lived alone with his children at Mas Verdoline, and the children were enrolled in the French equivalent of kindergarten.

In November of 2002, Respondent returned to France.  While she testified that she intended to stay only briefly and then return with the children to the United States, her visit was extended after Alexis was diagnosed with acute appendicitis requiring hospitalization and a recovery period.  Respondent also testified that she and her husband spoke of divorce in this period.  The minutes of

---

[2]A "*locum tenens*" position is one filed by a specialist physician on a temporary or short-term basis to cover staffing shortages.

a SCI-TAGIR meeting which occurred during Respondent's stay also show that the parties agreed to sell the lot in Cabris, and that they considered, but decided to put off, the sale of Mas Verdoline.

### 4.          December 2002-September 2003: The Twins Live in the United States

In December 2002, the twins traveled to Denver with their mother, and were enrolled in a Montessori school on December 10, 2002. Shortly thereafter, Respondent lowered the credit-line on the card used for Mas Verdoline's renovations from $50,000 to $5,000. While in the United States, Respondent and the boys traveled together to Yellowstone National Park, Florida and Baton Rouge to visit family members and go on vacation. Also during this time, Respondent learned that the lot in Cabris had sold for 1.2 million francs, a substantial profit over its original price.

During their stay in Denver, the district court found that "the children were becoming more and more socialized in the United States and had scant contact with their father." (J.A. 113.) Their father "rarely telephoned . . . and for the most part did not participate in holiday and birthday celebrations for the boys." (J.A. 114.) Indeed, the district court found the boys were "largely ignored by both Petitioner and all members of Petitioner's family," during their time in the United States. (*Id.*)

At the end of their stay in Denver, Respondent again made preparations to return to France with the twins. This time, she wrote Petitioner requesting a car with air conditioning in France, a French driver's license and a residence card. She later testified that the later was to ensure that she would be on a "level playing field" with Petitioner in any divorce proceeding in France. (J.A. 87-88.) Respondent terminated her apartment lease in September 2003, left Mas Verdoline as her forwarding address, and shipped several boxes to France, including the twins' fall and winter clothing and many of their books and toys. She also left some of her belongings behind in Denver. Respondent purchased round-trip tickets to France, leaving September 18, 2003, and returning to the United States on October 8, 2003.

### 5.          September 2003: The Twins' Final Trip to France

On September 19, 2003, Respondent and the twins landed in France, where they arrived to a "cool reception from Petitioner at the airport." (J.A. 115.) The family traveled together to Mas Verdoline. Upon their arrival, Respondent and the boys discovered that little progress had been made in renovating the house. According to the district court's findings of fact:

> Mas Verdoline was inhabitable only in the roughest terms and was not in a condition for a primary caregiver and two young children. For instance, there was an open staircase, no interior walls, and the floor boards on the second floor were only partially laid. The bathroom facilities at Mas Verdoline were equivalent to what might be termed "primitive." There was still no running water and the family was required to take sponge baths in a bucket of heated rainwater. The toilet was not connected and consisted of a bucket with a makeshift wooden seat. We can only imagine what it must have been like guiding a youngster to the toilet in the middle of the night from a second floor construction site with a flashlight to a bucket on the first floor.

(J.A. 116.)

Nevertheless, Respondent and the boys briefly remained in Mas Verdoline, and the twins were enrolled in the French equivalent of the first grade. During this time, Respondent met with a French lawyer to discuss divorce. On the morning of October 8, 2003, the parties had an argument concerning an outing to Nice to do the laundry, and Petitioner eventually left the house alone. When he returned home, Mas Verdoline was empty. He later received a call informing him that

Respondent's address book had been found at the Nice airport. After searching the home, he discovered a note informing him that Respondent had left with the boys to visit her sick mother in the United States.

In reality, Respondent's mother was not sick, and she later testified that the note was left as a "face-saving" device for Petitioner. (J.A. 90.) Respondent flew with the twins to New York City, began driving west, and eventually came to reside with Mark Campbell, a Lebanon, Ohio pharmacist whom she had met during a Florida vacation the previous month.

## B.    Procedural History

Respondent filed for legal separation from Petitioner in the Court of Common Pleas, Warren County, Ohio on December 3, 2003. Petitioner filed for divorce in the French Court of the First Instance in Grasse on January 23, 2004. Shortly thereafter, on March 22, 2004, he filed a criminal complaint against Respondent alleging "abduction of children and retention outside of France." (J.A. 91.) On September 22, 2004, the French court granted him temporary custody over Thomas and Alexis. French criminal charges were filed against Respondent on February 23, 2005, and although Respondent did not personally appear in French court, she was defended against these charges by counsel and eventually convicted on December 12, 2005, receiving a one-year suspended sentence. Court of the First Instance of Grasse, France, Dec. 12, 2005, No. 05/4311 NS.

In the Southern District of Ohio, Petitioner filed a Petition for Return of Children pursuant to the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.*, alleging that Respondent removed their children from France in violation of the Hague Convention. After conducting nine days of testimony and examining hundreds of exhibits, the magistrate judge issued a report and recommendation on June 29, 2005. Relying largely on the Ninth Circuit's decision in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), the magistrate judge found that the parties lacked a shared intent to remain in France, and recommended that the petition seeking return of Thomas and Alexis be denied. The district court adopted the magistrate judge's report in its entirety on May 19, 2006, and this appeal followed.

## DISCUSSION

### I.    The Legal Standard to Be Applied in Determining a Child's Habitual Residence under the Hague Convention

#### *Standard of Review*

The question of which standard should be applied in determining a child's habitual residence under the Hague Convention is one of law, and is reviewed *de novo* by this Court. *See United States v. Tocco*, 200 F.3d 401, 428 (6th Cir. 2000).

#### *Analysis*

The purpose of the Hague Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Hague Convention, Preamble. The Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*"). Additionally, according to the official commentary on the Hague Convention, the Convention should be read to prevent a circumstance where "the child is taken out of the family and social environment in which its life has developed." Elisa Perez-Vera, Explanatory Report ¶ 12, in

3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982) ("Perez-Vera Report").[3]

When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered. Hague Convention, Article 19; *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*"). Both the United States and France are signatory nations to the Hague Convention. *In re Prevot*, 59 F.3d 556, 558 (6th Cir. 1995).

Under the Hague Convention, the removal of a child from one nation to another is considered wrongful when:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Article 3. This appeal presents the question of what the proper meaning of "habitually resident" is under the Hague Convention.

## A.    Sixth Circuit Precedent

Because there is no Supreme Court authority on the question of habitual residence under the Hague Convention, our inquiry must begin with our sole precedent on this issue. In the first *Friedrich v. Friedrich*, this Court considered the petition of a German national whose son was removed to the United States without his permission. *Friedrich I*, 983 F.2d at 1399. Emanuel Friedrich, the petitioner in that case, was married to Jeana, a member of the United States Army stationed in Germany. *Id.* at 1398. Shortly after an argument which culminated with Emanuel casting Jeana and their son Thomas out of the family apartment, Jeana and Thomas left Germany for the United States. Excluding a ten-day visit to Jeana's parents in the United States, Thomas had lived his entire life in Germany prior to this incident. *Id.* at 1399.

Noting that Thomas had resided exclusively in Germany prior to his removal, we found *Friedrich I* to be a "simple case," and held him to be a habitual resident of Germany. *Id.* at 1402. Nevertheless, *Friedrich I* provides five principles which guide this Court in weighing more complicated decisions. First, habitual residence should not be determined through the "technical" rules governing legal residence or common law domicile. Instead, courts should look closely at "[t]he facts and circumstances of each case." *Id.* at 1401 (quoting *In Re Bates*, No. CA 122.89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989)). Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. *Id.* Third, this inquiry

---

[3] Many circuits hold Professor Elisa Perez-Vera's report to be an authoritative source for interpreting the Convention's provisions, *see, e.g.*, *Koch v. Koch*, 450 F.3d 703, 711 n. 4 (7th Cir. 2006); *Gitter v. Gitter*, 396 F.3d 124, 129 n. 4 (2d. Cir. 2005); *Mozes v. Mozes*, 239 F.3d 1067, 1069 n. 3 (9th Cir. 2001), and indeed the Hague Convention itself recognized Perez-Vera's report as official commentary. *See Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed.Reg. 10494, 10503 (1986) ("[Professor Perez-Vera's] explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it."). When interpreting a treaty, a court "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Air France v. Saks*, 470 U.S. 392, 396 (1985) (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-432 (1943).

should focus exclusively on the child's "past experience." "Any future plans" that the parents may have "are irrelevant to our inquiry." *Id.* Fourth, "[a] person can have only one habitual residence." *Id.* Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only "a change in geography and the passage of time" may combine to establish a new habitual residence. *Id.* at 1401-02.

## B.      Other Circuits

Some of our sister Circuits have parted ways with our decision in *Friedrich I.* Rather than limiting their inquiry to *Friedrich I*'s five guiding principles, these Circuits have introduced an additional factor: the subjective intent of the parents.

The first of these cases was the Third Circuit's decision in *Feder v. Evans-Feder*, 63 F.3d 217 (3d. Cir 1995). In *Feder*, the parties moved from Pennsylvania to Australia with Evan, their son who had lived in the United States almost his entire life. The parties purchased a home in Australia, enrolled Evan in an Australian pre-school, and placed their home up for sale. Mr. Feder took a job with an Australian bank, and while Ms. Evans-Feder harbored some concerns about the move and the future of her marriage, she also auditioned for and accepted a role with the Australian Opera Company. *Id.* at 219. After six months living together as a family in Australia, Evans-Feder removed her son to the United States. *Id.* at 220.

In holding that Evan was an habitual resident of Australia, the Third Circuit relied on a test which is largely a refinement of *Friedrich I*:

> Guided by the aims and spirit of the Convention and assisted by the tenets enunciated in *Friedrich v. Friedrich* and *Re Bates*, we believe that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place . . . .

*Id.* at 224.

The Third Circuit parted ways with this Court, however, in that it considered an additional factor. According to *Feder*, when a child's parents hold "present, shared intentions" regarding the child's stay in a particular location, then those mutually held intentions may be considered in determining that child's habitual residence. *Id.*

In *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), the Ninth Circuit went even further, holding that the subjective intentions of the parents are all but dispositive of a child's habitual residence. *See Id.* at 1076-78. *Mozes* divides Hague Convention cases into three types. The first consists of cases where "the court finds that the family as a unit has manifested a settled purpose to change habitual residence . . . ." *Id.* at 1076. In these cases, regardless of any reservations held by one parent or the other concerning the move, *Mozes* suggests that the child is a habitual resident of their new residence. *See id.* at 1077 ("When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose."). Similarly, "where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period . . . courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id.*

In the third *Mozes* category are cases where "the court is able to find no settled mutual intent" as to whether the parents intended to abandon one habitual residence in favor of another. *Id.* When a Hague Convention case falls into this third category, the Ninth Circuit places a heavy thumb on the scale against a finding of a new habitual residence. Relying largely on the decision of a Scottish court, *Mozes* held that, absent a shared intent by the parents to abandon a prior habitual residence, courts should only find a change in habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Id.* at 1081 (quoting *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)). The Ninth Circuit added that a court should not find that a new habitual residence has been established unless "we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed." *Id.* (quoting Perez-Vera Report, at ¶ 12 ("Perez-Vera Report")).

The Ninth Circuit expressly acknowledged that, by focusing on the subjective intentions of the parents, the rule established in *Mozes* is incompatible with this Court's decision in *Friedrich I*. According to *Mozes*, *Friedrich I* should have issued a narrow holding that "habitual residence cannot be acquired without physical presence." In the Ninth Circuit's view, "[t]he facts of *Friedrich* . . . provided no legitimate occasion for a broad pronouncement that parental intent is irrelevant to the question of habitual residence." *Id.* at 1080.

## C.    The Decision Below

Ignoring this Court's binding decision in *Friedrich I*, the magistrate judge applied the Ninth Circuit's rule in determining that Thomas and Alexis Robert are habitual residents of the United States. The magistrate judge determined that "the parties held no shared intent to abandon the United States," and concluded that "[i]n the absence of shared intent, the Court examines the evidence to determine whether 'the objective facts point unequivocally' to the conclusion of a new habitual residence in France." (J.A. 109 (quoting *Mozes*, 239 F.3d at 1081.)) This test, which looks first to the subjective intentions of the parents and then engages in a heavy presumption that the child did not acquire a new habitual residence, is identical to the rule handed down in *Mozes*, and is incompatible with this Court decision in *Friedrich I*. *Mozes*, 239 F.3d at 1080-81.

Rather than apply the Ninth Circuit's rule in *Mozes*, the magistrate judge should have followed this Court's decision in *Friedrich I*—that is, the court below should have focused solely on the past experiences of the child, not the intentions of the parents. *Friedrich I*, 983 F.2d at 1401.

The Ninth Circuit's rule is not only inconsistent with this Court's precedent, but, according to one district judge, it has "made seemingly easy cases hard and reached results that are questionable at best." *Koch v. Koch*, 416 F.Supp.2d 645, 651 (2006) *aff'd on other grounds* 450 F.3d 703 (7th Cir. 2006). In *Ruiz v. Tenorio*, 392 F.3d 1247 (11th Cir. 2004), for example, the Eleventh Circuit applied *Mozes* and reached just such a result. *Ruiz* involved a family of four who left the United States in August 2000 to live as a family in Mexico. *Id.* at 1249. While in Mexico, the children attended school and played with Mexican friends. *Id.* at 1255. Their father worked full-time for the family business in Mexico. *Id.* at 1249. The family brought nearly all of their possessions with them to Mexico, and the family began construction on a house in Mexico. *Id.* at 1249-50. From the time of the move until the time of their removal, the children lived for almost three full years in Mexico, visiting the United States only twice. *Id.* at 1250. On May 20, 2003, the children's mother removed them to Florida, and the father sought their return under the Hague Convention. *Id.*

Although the two children lived exclusively in Mexico for two years and ten months prior to their removal to Florida, the Eleventh Circuit held that they were habitual residents of the United

States. *Id.* at 1254. According to *Ruiz*, the parties "never had a shared intention to abandon the prior United States habitual residence and to make Mexico the habitual residence of their children." *Id.* In reaching this decision, the court relied entirely on the subjective intentions of the parents. The children's mother, said the court, had told their grandmother that "if it did not work out in Mexico, they would come back to the United States." *Id.* The mother retained an American bank account and credit card, and had mail forwarded to the United States. Additionally, while the family was already living in Mexico, the mother moved her nursing license to Florida and the father briefly searched for an American job on Monster.com. *Id.* at 1250, 1254. It was unclear from the decision in *Ruiz* whether the children were even aware of these connections which their parents maintained in the United States. Nevertheless, the court held this sparse evidence to be sufficient to demonstrate the parents never intended to settle in Mexico. *Id.* at 1254-55. Three years of living in a Mexican home and attending a Mexican school were outweighed by the subjective intentions of the children's parents.

The Hague Convention is intended to prevent a case where "the child is taken out of the family and social environment in which its life has developed." Perez-Vera Report at ¶ 12; *see also Mozes*, 239 F.3d at 1081 (quoting same). *Ruiz*, and the *Mozes* decision it relied upon, run counter to this goal. A child who lives in Mexico, attends Mexican school, and makes Mexican friends for three years builds an attachment to Mexico that would lead any child to call that country "home." The *Ruiz/Mozes* rule, however, would take this child out of the "family and social environment in which its life has developed," and return him to the nation of their abductor simply because that abductor held personal reservations about the original move to Mexico. Such a rule turns the Hague Convention on its head, and it cannot be followed by the Sixth Circuit in light of our *Friedrich I* decision.

The *Mozes* rule is also inconsistent with the Convention's goal of "deter[ring] parents from crossing borders in search of a more sympathetic court." *Friedrich II*, 78 F.3d at 1064. By considering the subjective intentions of the parents, the *Mozes* rule empowers a future abductor to lay the foundation for an abduction by expressing reservations over an upcoming move. Once the future abductor has laid this foundation, the non-abducting parent may only seek their children's return by proving that "the objective facts point unequivocally" to the child's home being in the new country. *Mozes*, 239 F.3d at 1081. The Hague Convention is intended to "secure the prompt return of children wrongfully removed," not to erect such barriers to a child's return. Article 1.

Finally, the official commentary on the Hague Convention establishes that the Convention should be interpreted in light of the "general principle . . . that 'children must no longer be regarded as parents' property, but must be recognised [sic] as individuals with their own rights and needs." Perez-Vera Report, at ¶ 24 (quoting Parliamentary Assembly of the Council of Europe, Recommendation 874 (1974)). This general principle is best given effect by a holding which honors the child's perception of where home is, rather than one which subordinates the child's experience to their parents' subjective desires.

For the foregoing reasons, we hold that the magistrate judge was prohibited from applying the *Mozes* rule by *Friedrich I*. This holding not only respects the binding nature of past precedent, but also better serves the purposes of the Hague Convention than the holding in *Mozes*.

## D. The Proper Standard

While the *Mozes* rule is inconsistent with this Court's holding in *Friedrich I*, not all post-*Friedrich I* developments should be rejected by the Sixth Circuit. *Friedrich I* was, by its own admission, a "simple case." 983 F.2d at 1402. It involved a child who "resided exclusively in Germany until his mother removed him to the United States," *id.*, and as such, did not provide this

Court with an opportunity to determine what standard should apply when a child has alternated residences between two or more nations.

Fortunately, several other Circuits have considered this issue, and their precedents reveal a growing consensus around two factors which are consistent with this Court's holding in *Friedrich I*. In *Feder*, the first post-*Friedrich I* Court of Appeals decision to consider the meaning of "habitual residence," the Third Circuit held that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective . . . ."[4] *Feder*, 63 F.3d at 224. This *Feder* test—that a child's habitual residence is a nation where the child has been present long enough to allow "acclimatization," and where this presence has a "degree of settled purpose from the child's perspective"—has influenced numerous other Circuits. *See, e.g.*, *Kijowska v. Haines*, 463 F.3d 583, 588 (7th Cir. 2006) (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291-92 (3d Cir. 2006) ("habitual residence is the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective")); *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) ("Federal courts are agreed that 'habitual residence' must encompass some form of 'settled purpose.'"); *In re Tsarbopoulos*, No. 00-35393, 2000 WL 1721800, at *1 (9th Cir. Nov. 17, 2000) (unpublished opinion) ("United States courts have typically focused on . . . whether the children have sufficiently acclimatized to the new location."); *Zuker v. Andrews*, No. 98-1622, 1999 WL 525936, at *1 (1st Cir. Apr. 9, 1999) (unpublished opinion) ("[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. . . ." (quoting *Feder*, 63 F.3d at 224)).

The Hague Convention protects the right of children "not to have the emotional, social etc. aspects of their lives altered, unless legal arguments exist which would guarantee their stability in a new situation." Perez-Vera Report, at ¶ 72. We believe that this goal is well served by the Third Circuit's decision in *Feder*. Accordingly, we hold that a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a "degree of settled purpose from the child's perspective." *Feder*, 63 F.3d at 224. Such a holding is not only consistent with the collective wisdom of many of our sister Circuits, but it is also consistent with *Friedrich I*'s holding that a habitual residence inquiry must "focus on the child, not the parents, and examine past experience, not future intentions." 983 F.2d at 1401.

## II. The Evidentiary Standard Applied by the District Court in Determining a Child's Habitual Residence under the Hague Convention

### *Standard of Review*

"'In reviewing a trial court's evidentiary determinations, this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions.'" *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003) (quoting

---

[4] As discussed above, *Feder* also considered the "parents' present, shared intentions" as a factor in determining the child's habitual residence. 63 F.3d. at 224. However, this third *Feder* factor is inconsistent with this Court's precedent requiring that "the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401.

The Third Circuit has also held that the subjective intentions of a "very young" child's parents are particularly important to determining that child's habitual residence. *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004). While we recognize that a very young or developmentally disabled child may lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose, *id.*, this case does not present us with such a child. We therefore express no opinion on whether the habitual residence of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents.

*United States v. Salgado*, 250 F.3d 438, 451 (6th Cir. 2001)). Because the question of which evidentiary standard applies in a given case is one of law, we review this question *de novo*. *See United States v. Tocco*, 200 F.3d 401, 428 (6th Cir. 2000).

### *Analysis*

Petitioner asserts that "[t]he District Court erred by requiring Petitioner to meet an "unequivocal evidence" standard, rather than a "preponderance of the evidence" standard, to prove that the children's habitual residence was in France. (Petitioner's Br. at 50.) We agree.

By federal statute, the Hague Convention is implemented by the International Child Abduction Remedies Act, which establishes that a petitioner seeking return of a child under the Hague Convention "shall establish by a preponderance of this evidence . . . that the child has been wrongfully removed or retained . . . ." 42 U.S.C. § 11603(e)(1). This preponderance of the evidence standard has been recognized by this Court. *See Friedrich II*, 78 F.3d at 1064 ("[T]he plaintiff in an action for return of the child has the burden of proving the exercise of custody rights by a preponderance of the evidence."). Rather than apply this preponderance of the evidence standard, however, the magistrate judge applied the heightened standard of evidence adopted by the Ninth Circuit in *Mozes*.

According to the decision below, "the Court examines the evidence to determine whether 'the objective facts point unequivocally' to the conclusion of a new habitual residence in France." (J.A. 109 (quoting *Mozes*, 239 F.3d at 1081.)) This unequivocal evidence standard was first articulated by a Scottish Court in *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.), and was imported into the United States by the Ninth Circuit in *Mozes*. 239 F.3d at 1081. While the Supreme Court has held that, in interpreting treaties, a court should "find the opinions of our sister signatories to be entitled to considerable weight," *Air France*, 470 U.S. at 404, the weight of a foreign court decision cannot overcome a superceding Act of the United States Congress. *See Whitney v. Robertson*, 124 U.S. 190, 193-94 (1888) ("[I]f there be any conflict between the stipulations of the treaty and the requirements of the law, the latter must control."). The International Child Abduction Remedies Act expressly states that courts should apply a preponderance of the evidence standard, 42 U.S.C. § 11603(e)(1), not the unequivocal evidence standard adopted by Scotland and the Ninth Circuit. As a United States Court of Appeals, this Court is bound by Congress' decision.

Respondent argues that Petitioner failed to object to the magistrate judge's use of the incorrect evidentiary standard, and thus claims this issue is waived on appeal. We disagree. While it is true that a general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal, *see Howard v. Secretary of Health and Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991), this Court has held that an objection preserves an issue when it "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Smith v. Chater*, No. 96-3325, 1997 WL 415309 (6th Cir. July 18, 1997) (unpublished opinion).

In this case, Petitioner filed 65 individual objections to the magistrate judge's report. According to one of those objections, "Petitioner objects to the manner in which the Magistrate [Judge] failed to apply the dictates of *Friedrich I*, as set forth at the top of page 26, i.e., to 'focus on the child, not the parents, and examine past experience, not future intentions.'" (J.A. 139.) This objection is not a general objection to the magistrate judge's entire report. Rather, it cites and specifically quotes the language of the report which Petitioner found problematic, and gives the specific page number where that language may be found. Furthermore, it expressly states Petitioner's belief that the magistrate judge should have applied *Friedrich I*, rather than the Ninth Circuit's decision in *Mozes*. As has already been discussed, the magistrate judge's decision to

erroneously apply an unequivocal evidence standard stems from its error in applying *Mozes*. Therefore, the district judge would have no difficulty determining from this objection that Petitioner objected to the application of the *Mozes* standard in lieu of the *Friedrich I* standard, and by extension, that the magistrate judge should not have applied those parts of *Mozes* which are inconsistent with *Friedrich I*.

We therefore hold that the magistrate judge applied the wrong standard of evidence in deciding this case. Accordingly, the evidence in this case should have been considered under a preponderance of the evidence standard.

## III. Thomas and Alexis Were Habitual Residents of the United States at the Time of Their Removal

### *Standard of Review*

The question of Thomas and Alexis' habitual residence is one of fact, and is reviewed for abuse of discretion. Therefore, this Court reviews questions of law *de novo* and questions of fact for clear error. *Blackard v. Memphis Area Medical Center for Women, Inc.*, 262 F.3d 568, 572 (6th Cir. 2001). In cases arising under the Hague Convention, the petitioner must prove by a preponderance of the evidence that the children who are the subject of the petition were removed from their habitual residence. *Friedrich I*, 983 F.3d at 1400.

### *Analysis*

### A. Expedited Review Under the Hague Convention

Thus far, we have reached two conclusions: 1) A child acquires a new habitual residence when, focusing exclusively on the child's experience, they are present in a new country long enough to allow acclimatization, and that presence has a degree of settled purpose; and 2) a court should determine a child's habitual residence under a preponderance of the evidence standard. The only remaining issue is whether to reverse and remand this case for the district court to apply the proper legal standard, or to decide the outcome of the case at the Court of Appeals level.

The Hague Convention instructs "[t]he judicial or administrative authorities of Contracting States [to] act expeditiously in proceedings for the return of children," Hague Convention, Article 11, and requires the return of a child "forthwith" to their nation of habitual residence if a meritorious petition is filed within a year of the child's removal. Article 12. These provisions were emphasized to this Court in a letter from the United States Department of State "request[ing] expeditious consideration as required by Article 11 of the Convention." (Letter from Julie Furuta-Toy, Director, Office of Children's Issues, United States Central Authority to United States Court of Appeals for the Sixth Circuit of 8/9/2007, at 2). Faced with Article 11's mandate, we believe that the Hague Convention requires this Court to resolve this case in its entirety, given a sufficiently developed record to allow us to do so.

Such a well-developed record does exist in this case. In addition to deposition testimony from both parties, the magistrate judge conducted nine days of hearings and examined numerous exhibits, including correspondence between the parties, financial records and photos of their belongings and homes. Allowing additional testimony or exhibits to be submitted would contribute little to the already bulging record in this case.

### B. Thomas and Alexis' Habitual Residence

Turning now to the merits of the case, we hold that even though the district court applied an incorrect legal standard in determining Thomas and Alexis' habitual residence, it reached the correct

result in holding that they were habitual residents of the United States at the time of their removal from France.

The Third Circuit's recent decision in *Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006) provides helpful guidance to courts determining whether a child has been acclimatized to a new country and whether their stay in that new country has a settled purpose. *Karkkainen* involved a child named Maria whose mother lived in Finland and whose father resided in the United States. *Id.* at 285. Maria was fluent in Finnish, English and Russian, and had extensive experience traveling in both Europe and the United States. After being told by her stepfather—in the presence of her mother—that she was free to move permanently to the United States if she chose, Maria left to live with her father and enrolled in an American school. *Id.* at 286. Maria had resided in the United States for three months when her mother filed a petition seeking her return under the Hague Convention. *Id.*

The Third Circuit's opinion denying this petition is instructive in several regards. First, it considers parental conduct in a manner which is consistent with this Court's decision in *Friedrich I*. Rather than focusing on her mother's subjective intentions regarding Maria's nation of residence, the Third Circuit focused on how Maria's mother and stepfather "colored her attitude" towards her stay in the United States by communicating to her that she would be "permitted to choose where she would live . . . ." *Id.* at 294. This focus on Maria's experience is consistent with the Sixth Circuit's dictate that a habitual residence inquiry must "focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401.

*Karkkainen* also listed several factual circumstances which a court could consider in determining whether or not a child's stay in a new country meets the tests of "acclimatization," and "settled purpose." Among these factual circumstances, the Third Circuit held that "academic activities are among 'the most central . . . in a child's life' and therefore highly suggestive of acclimatization." 445 F.3d at 293 (quoting *Feder*, 63 F.3d at 224). The court also noted that "social engagements," "participation in sports programs and excursions," and "meaningful connections with the people and places" in the child's new country all point to the child being acclimatized. *Id.* at 294. Additionally, the court held that the fact that Maria "brought more personal belongings with her than usual, in anticipation that she would remain [in the United States]" was evidence of a settled purpose to reside in the United States. *Id.* Finally, the court considered Maria's own stated desire to reside in the United States, combined with her parents' communication to her that she was free to act on this desire, and held this to be a significant factor in determining that she had a settled purpose to reside in the United States.

Many of the factors considered by the Third Circuit in *Karkkainen* are also present in the instant case. Admittedly, some of these factors cut in both directions. The magistrate judge, for example, found that the boys were fluent in both French and English at the time of their removal, and the boys attended both French and American schools during their time in both countries. Nevertheless, a preponderance of the evidence demonstrates that the boys were habitual residents of the United States at the time of their removal from France.

Even assuming that the boys acquired an habitual residence in France during their 15 month stay in that country, the boys took up a new habitual residence in the United States during the period beginning December 2002 when they lived in Denver. While in Denver, the boys attended an American kindergarten. They vacationed with Respondent's sister and family to Yellowstone National Park, and they visited their maternal grandmother in Baton Rouge. As the magistrate judge found, the children became "more and more socialized in the United States." (J.A. 113.) They attended American schools, formed meaningful relationships with their American relatives, and participated in excursions throughout the United States.

This America-centered experience contrasts dramatically with the boys' contact with France during this period. As the magistrate judge found, the children had "scant contact with their father," contact which could have helped them maintain a sense of French identity. (J.A. 113.) Similarly, the boys were "largely ignored" by their French relatives, and they celebrated holidays and birthdays almost exclusively with the American side of their family. In effect, the boys' ties with France were cut while they lived in Denver, and all of these facts point to a finding that the boys were habitual residents of the United States.

Having determined that the boys were habitual residents of the United States at the time they boarded their September 2003 flight to France, the remaining question is whether or not their habitual residence changed from the United States to France during their three week stay at Mas Verdoline. *See Karkkainen*, 445 F.3d at 294 ("[I]t does seem implicit in the concept of acquiring a new 'habitual' residence that the previous 'habitual' residence has been left behind or discarded."). A preponderance of the evidence suggests that it did not.

Admittedly, some evidence points to a conclusion that the boys did acquire a new habitual residence while in France. The boys were already fluent in French, and they were briefly enrolled in a French school. These facts, however are not sufficient to outweigh the volumes of evidence suggesting that the boys would have perceived their stay in France to be merely a temporary journey before they returned to a permanent residence in the United States. First, their French father did little to welcome them to France or communicate that they should expect a long stay. The magistrate judge found that the boys received a "cool reception from Petitioner at the airport" upon their arrival in France. (J.A. 115.) Moreover, according to Respondent's testimony, Petitioner did not hug or even acknowledge the boys, and he even expressed surprise that they actually came to France in the first place. Second, unlike the child in *Karkkainen* who brought significant amounts of her possessions to her new residence in anticipation that she would remain there, Thomas and Alexis brought only "two seasons worth of clothing" to France, a fact that suggests a return to the United States when the weather became warmer. (J.A. 115.) Third, the actual length of the boys' stay in France was only three weeks, hardly enough time for them to become "acclimatized" to a new residence, and far less than the ten months they had recently spent in the United States. Finally, the rough state of Mas Verdoline would suggest to any child that the French house was completely unlivable.

The magistrate judge found that Mas Verdoline was "not in a condition for a primary caregiver and two young children." (J.A. 116.) This finding was supported by the fact that the home had no interior walls, "primitive" bathroom facilities, an "open staircase" and that the floorboards were only "partially laid." (*Id.*) If anything, this description of the house is too charitable. Pictures of Mas Verdoline which are included in the record depict a half-complete interior, strewn with power-tools, exposed wires and plumbing, wooden boards waiting to be attached to the house, and other objects including several bottles containing unknown liquids. The only access to the second floor was an aluminum ladder of the sort available at any hardware store, and the only access to one section of the upstairs was a makeshift bridge consisting of two wooden planks. No child, having lived in the relative safety and comfort of a Denver apartment, could believe that they had arrived at this hazard-riddled construction site with the settled purpose to leave the United States behind and make a new habitual residence in France.

The twins' final trip to France lasted only three short weeks. In that time, they had few experiences that would have acclimatized them to their new surroundings, or which would indicate a settled purpose to remain in France. Indeed, most of their experiences at Mas Verdoline suggest the opposite. Accordingly, we hold that the twins' habitual residence at the time of their removal from France was the United States.

## CONCLUSION

In summary, we hold that *Friedrich I*'s edict that "the court must focus on the child, not the parents, and examine past experience, not future intentions" controls this case. 983 F.2d at 1401. While this holding places us at odds with the Ninth Circuit's decision in *Mozes*, we believe that focusing on the child's experience, and not the parents' subjective desires, best serves the Hague Convention's purposes of preventing a case where "the child is taken out of the family and social environment in which its life has developed." Perez-Vera Report at ¶ 12, "deter[ring] parents from crossing borders in search of a more sympathetic court." *Friedrich II*, 78 F.3d at 1064, and ensuring that "children [are] recognised [sic] as individuals with their own rights and needs." Perez-Vera Report, at ¶ 24.

Nevertheless, we recognize that *Friedrich I* was the first United States Court of Appeals case to consider the meaning of "habitual residence" under the Hague Convention, and that it presented a far simpler set of facts than the ones at issue here. Accordingly, our holding in *Friedrich I* should be refined to incorporate some of the wisdom of our sister circuits, without disturbing *Friedrich I*'s core holding that habitual residence under the Hague Convention is determined by the child's experience, not by the parents' subjective intent. To this end, we hold "that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Feder,* 63 F.3d at 224. Applying this test to the facts of this case, we hold that Thomas and Alexis were habitual residents of the United States at the time of their removal from France, and **AFFIRM** the decision of the district court.