NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0438n.06

No. 21-1335

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 21, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| HEATH RICHARD DOUGLAS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| NANCY SUMMERS DOUGLAS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

**BEFORE: SUTTON, Chief Judge; McKEAGUE and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner-Appellant Heath Richard Douglas (Heath) appeals the district court's grant of summary judgment to his former spouse, Nancy Summers Douglas (Nancy), in this dispute under the Hague Convention on the Civil Aspects of International Child Abduction, in which the issue is the habitual residence of the parties' child. We AFFIRM.

**I.**

In late October 2017, Heath, an Australian man, contacted Nancy, an American woman, on a dating website. Heath lived in Curlewis, New South Wales (NSW), Australia, and Nancy lived in Boston, Massachusetts. Heath and Nancy began communicating via telephone in November 2017. The same month, the parties began planning for Nancy to visit Heath. Heath purchased a roundtrip ticket for Nancy to fly to Australia for "[a] few weeks" beginning in late

December. R. 35-3, PID 285. Nancy left her associate-editor job in Boston, where she had worked since August 2016. The same company hired her to work remotely as a freelance editor.

Nancy arrived in Australia on December 21, 2017. Upon her arrival, Heath gave her an American Express card with $7,000 and told her, "[L]ook, any time you want to go back, use that, go home, you don't have to stay." R. 35-2, PID 263. When Nancy arrived in Australia, the parties lived separately.

Shortly after Christmas, Heath proposed marriage, and Nancy accepted. The parties were married on February 10, 2018. Nancy moved into Heath's home, and within a month, she became pregnant.

The couple began arguing soon after their marriage. The arguments occurred "[e]very few days" and were "[s]evere." R. 35-3, PID 289. Nancy testified that the "themes" of these arguments were "[t]hat [she] was disrespecting [Heath] and not submitting to [him]." *Id.* Heath threatened to kill himself and told Nancy it would be "[her] fault if he committed suicide." *Id.* at PID 286. He also "threatened that he is a trained boxer who can kill someone in one punch and if [Nancy] were a man, he would have hit [her] already." *Id.* One night in August 2018, Heath "suddenly got on top of [Nancy] and grabbed both of [her] arms to get [her] to stop talking." *Id.* at PID 288. Heath also "flipped [Nancy] on the bed." *Id.* According to Nancy, she "was sitting on the side of the bed . . . talking and [Heath] didn't like what [she] was saying and flipped [her] onto [her] back so that [she] rolled on the bed." *Id.*

Despite the parties' marital strife, they attempted to build a life together in Australia. On June 6, 2018, Heath paid $7,000 to the Australian Department of Home Affairs to sponsor Nancy's Permanent Partner Visa. Nancy obtained a debit card linked to Heath's National Australian Bank account. On June 29, 2018, the parties signed a twelve-month lease for an apartment in

Merewether, NSW. In September 2018, Nancy drafted a list of two-year goals. One of her goals was "baby #2 on the way by 2020/2021?" R. 41-9, PID 446. On October 31, 2018, Nancy obtained an NSW driver's license. The parties also discussed a potential ten-year commitment to stay in Australia. Heath believed that the parties "promised ten years [in Australia] and then [they] would go to America." R. 41-5, PID 437.

By October 2018, the parties began seeking marriage counseling. They also met with multiple pastors. Because Heath thought that he might "hit" Nancy, a pastor advised him to "get [Nancy] out of the house." R. 35-2, PID 269. At the end of October, Heath told Nancy that he "[couldn't] handle this" and stayed at a motel for the night. *Id.* Around the same time, he told Nancy to "get the F out" of the apartment. R. 35-3, PID 290. He then ran after her and she returned, telling him that she wanted a divorce. However, the couple did not divorce at that time.

Nancy and Heath's son, J.D., was born in Australia on November 4, 2018. Nancy's mother flew to Australia for J.D.'s birth.

On the morning of November 7, 2018, Heath and Nancy got into an argument. When Heath returned home from work, he told Nancy to "get out" of the apartment. *Id.* He also threatened to take J.D. to western Australia. Police were summoned to the apartment.

For the next three months, Nancy, her mother, and J.D. moved between rentals and other temporary housing. Heath and Nancy have not lived together since November 7, 2018.

On November 21, 2018, Nancy sent an e-mail to Heath stating:

> The marriage is over.
> I would like to return to America with [J.D.]
> Will you agree to this and sign his [Australian-passport application]?
> There can still be ways to see and spend time with [J.D.] . . . .
> This email confirms that we have officially separated as of today, 21/11/18.

R. 35-5, PID 300. After separating from Heath, Nancy applied for child support. On December 3, 2018, a law firm representing Nancy wrote a letter to Heath informing him that Nancy "wishes

to return to Michigan . . . to live with her parents . . . and seeks to also relocate [J.D.'s] residence to the United States." R. 35-7, PID 305. On December 7, 2018, Heath sent Nancy an e-mail stating, "I understand that you really do not want me in your life anymore, and this really hurts." R. 35-8, PID 309. On December 9, 2018, Heath wrote Nancy another e-mail stating, "you obviously aren't coming back to me." R. 35-9, PID 311. Sometime between December 2018 and January 2019, Heath left the parties' Merewether apartment and moved over three hours away, back to Curlewis.

On December 13, 2018, Heath commenced a custody proceeding in federal circuit court in Australia.

On December 15, 2018, Nancy wrote a letter to Heath:

> please sign [J.D.'s Australian-passport application] so I can go somewhere where I have support and people I know and a free place to stay. I need the space. If you want, I can show you my return ticket.
> if you really love me, you'll let me go.

R. 35-11, PID 316. As it turns out, Nancy had not purchased a return ticket to Australia, and Heath did not ask to see a return ticket.[1]

On December 24, 2018, Heath responded:

> OK nancy,
> Merry Christmas
> Please take care of our little man.

*Id.* On the back of his letter, Heath wrote:

> No conditions
> No expectations
> I will provide,
> love heath xo

---

[1] On December 20, 2018, Nancy contacted police about the volume of text messages she was receiving from Heath. R. 35-13, PID 337. She obtained a provisional "Apprehended Domestic Violence Order" (ADVO) against Heath. *Id.* at PID 333–38. The ADVO prohibited Heath from directly contacting Nancy. *Id.* at PID 334.

*Id.* at PID 317. Heath signed J.D.'s Australian-passport application. Also on December 24, 2018, Heath dismissed the custody proceeding he initiated earlier that month. In January 2019, Heath paid a child-support assessment.

On January 11, 2019, Heath wrote a letter to Nancy stating:

> You are free to go home now. I am sorry for not getting these through to you earlier, but maybe the timing is just right? I don't know.
> I want the best for you and [J.D.] and if that is back in America with your folks, then you have my blessing!
> Thanks for your patience with me as I learnt what it is to be a good Dad and friend.
> I have never had to sacrifice so much!
> Be blessed nancy!

*Id.* at PID 318. On January 30, 2019, Heath signed a letter authorizing J.D. to travel with Nancy to the United States. The next month, Nancy unilaterally withdrew her Permanent-Partner-Visa application.

While in Australia, Nancy maintained American bank accounts, filed U.S. tax returns, and maintained a mailing address in the United States. After separating from Heath, she opened an Australian bank account to facilitate her receipt of financial assistance.

On February 13, 2019, Nancy and J.D. flew to the United States. Nancy ended Heath's child-support assessments. Since their arrival, Nancy and J.D. have lived with Nancy's parents in Michigan.

Heath traveled to the United States in August 2019. Security footage from August 22, 2019 captured Heath appearing without notice at Nancy's home. He left within five minutes. Heath also appeared with luggage and flowers at Nancy's father's workplace.

Nancy filed for divorce in September 2019 and served Heath with divorce papers in Australia on October 3, 2019.

Heath filed this petition for return of J.D. on May 14, 2020. Following discovery on the issue of J.D.'s habitual residence, Nancy filed a motion for summary judgment, arguing that there is no genuine dispute that J.D.'s habitual residence was the United States. The district court granted Nancy's motion, concluding that immediately before the alleged wrongful retention, J.D.'s "habitual residence" was Michigan, not Australia. Heath appealed.

## II.

This court reviews de novo a grant of summary judgment, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A. Habitual Residence Under the Hague Convention

In 1980, the Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) "[t]o address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quotation omitted). "The goal [of the Hague Convention] is to prevent a child from being 'taken out of the family and social environment in which its life has developed.'" *Ahmed v. Ahmed*, 867 F.3d 682, 687 (6th Cir. 2017) (quoting *Robert v. Tesson*, 507 F.3d 981, 991–92 (6th Cir. 2007)). "The Hague Convention is also meant to deter parents from crossing borders in search of more favorable forums." *Id.* (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)).

The Hague Convention "ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky*, 140 S. Ct. at 723 (citing Hague Convention, Article 12). Under the Hague Convention, the removal or retention of a child is wrongful if

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Robert*, 507 F.3d at 988 (quoting Hague Convention, Article 3).

The United States and Australia are signatories to the Hague Convention. Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last updated July 19, 2019). The International Child Abduction Remedies Act (ICARA) implements the Hague Convention in the United States. *See* 22 U.S.C. § 9001 *et seq.*

"Under the ICARA, a petitioner seeking the return of a child under the Hague Convention must prove by a preponderance of evidence that the child was wrongfully retained or removed from her habitual residence." *Ahmed*, 867 F.3d at 686. The burden then shifts to the respondent to establish one of the Hague Convention's "exceptions." 22 U.S.C. § 9003(e)(2); *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).

"[A] court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute. If the petitioning party shows that the Hague Convention requires return to the abducted-from nation, the child is returned there to determine custody . . . ." *Ahmed*, 867 F.3d at 687 (citations omitted).

"[A] child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. at 723. "A person can have only one habitual residence." *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007) (quotation omitted). In *Monasky*, the Supreme Court articulated several principles for determining habitual residence. The term "habitual" "suggest[s] a fact-sensitive inquiry, not a categorical one." *Monasky*, 140 S. Ct. at 726. Habitual residence does not turn on the existence of an actual agreement or on any other categorical requirement. *Id.* at 726, 728. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* at 726. A child's residence in a particular country can only be considered "habitual" when "her residence there is more than transitory." *Id.* "What makes a child's residence 'habitual' is . . . 'some degree of integration by the child in a social and family environment.'" *Id.* (quotation omitted). Moreover,

> [b]ecause locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Id.* at 727 (citations omitted). And "[a]n infant's 'mere physical presence' . . . is not a dispositive indicator of an infant's habitual residence[,] . . . [b]ut a wide range of facts[,] . . . including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Id.* at 729.

**B. Date of Wrongful Retention**

Heath's complaint alleges that Nancy's retention of J.D. became wrongful on October 3, 2019. At the summary-judgment stage, Heath sought to amend his petition to allege that the retention became wrongful on May 14, 2019. The district court denied Heath's request to amend. Heath does not challenge the wrongful-retention date on appeal. *See generally* Appellant's Br. Accordingly, we adopt October 3, 2019 as the operative wrongful-retention date. *See Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 524 (6th Cir. 2019) (adopting the district court's determination regarding the wrongful-retention date where the parties did not challenge the date on appeal).

**C. J.D.'s Habitual Residence**

One factor informing a young child's habitual residence is the caregiving parents' "intentions and circumstances." *Monasky*, 140 S. Ct. at 727. Some evidence suggests that before J.D. was born, the parties may have intended to raise him in Australia: Nancy obtained a debit card linked to Heath's National Australian Bank account; the parties signed a twelve-month lease for an apartment in Merewether; Nancy obtained an NSW driver's license; the parties contemplated a ten-year plan to live in Australia; and Nancy applied for a Permanent Partner Visa.

Other evidence, however, more strongly indicates that by the wrongful-retention date, the parties intended for J.D. to live in the United States. In October 2018, the parties got into an argument in which Heath told Nancy to "get the F out" of their apartment and Nancy told Heath that she wanted a divorce. R. 35-3, PID 290. Three days after J.D. was born, Heath exiled Nancy from the apartment again. The parties lived separately after that point. On December 3, 2018, a law firm representing Nancy informed Heath that Nancy wished to return to Michigan and relocate J.D.'s residence there. Heath's e-mails from December 7 and 9, 2018 stated, "I understand that

you really do not want me in your life anymore" and "you obviously aren't coming back to me." R. 35-8, PID 309; R. 35-9, PID 311. On December 24, 2018, in response to Nancy's request for Heath to sign J.D.'s passport application, Heath replied, "OK nancy, . . . Please take care of our little man." R. 35-11, PID 316. On the back of the letter, Heath wrote, "No conditions / No expectations." *Id.* at PID 317. On the same day, Heath signed J.D.'s passport application and dismissed the custody proceeding he had initiated eleven days earlier. On January 11, 2019, Heath sent a letter to Nancy stating, "You are free to go home now. . . . I want the best for you and [J.D.] and if that is back in America with your folks, then you have my blessing!" *Id.* at PID 318. In a letter dated January 30, 2019, Heath authorized J.D. to travel with Nancy to the United States.

Heath argues that he wrote "No conditions / No expectations" "after Nancy's promise to return," and that this context creates an issue of fact as to the parties' intent. Appellant's Br. at 32–33. Heath testified that "No conditions / No expectations" meant he "didn't want to put any expectation or conditions on her travel if she needed to go anywhere to see friends [or] family," he "[did not] want to be a controlling husband[,] and [he did not] want to hold her back if she need[ed] to go anywhere." R. 35-2, PID 274. Because we must draw all reasonable inferences in Heath's favor, we take this testimony as true. *See Fisher*, 951 F.3d at 416. But even accepting this interpretation of the December 24th correspondence, other evidence in the record, including Heath's January letters and the parties' conduct, establish that by the wrongful-retention date, the parties intended for J.D. to live in the United States.

Another relevant consideration is the "degree of integration by the child in a social and family environment." *Monasky*, 140 S. Ct. at 726 (quotation omitted). When Heath directed Nancy to leave their apartment, J.D. was three days old. For three months afterward, Nancy, her mother, and J.D. moved between rentals and other temporary housing. Heath moved over three

hours away from the Merewether apartment. J.D. was not meaningfully integrated in any social or family environment in Australia; his residence there was merely transitory. In contrast, J.D. had lived in Michigan with his mother and maternal grandparents for over seven months by the wrongful-retention date. Thus, as of October 3, 2019, J.D. was "at home" in Michigan, not Australia. *See id.*

No reasonable jury, considering the totality of the circumstances, could conclude that Heath demonstrated by a preponderance of the evidence that J.D.'s habitual residence was Australia as of the operative wrongful-retention date.

**III.**

For the foregoing reasons, we AFFIRM the district court's judgment.