NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0188n.06

No. 16-1825

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

March 27, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN MICHAEL NEUMANN, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JULIE ANNE NEUMANN, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: DAUGHTREY, ROGERS, and COOK, Circuit Judges.

ROGERS, Circuit Judge. In this difficult case under the Hague Abduction Convention, the district court ordered two children to be returned to Mexico after carefully analyzing whether, under the terms of the Convention, returning them posed "a grave risk" of "expos[ing] [them] to physical or psychological harm or otherwise plac[ing] [them] in an intolerable situation." The district court concluded that the return posed no such grave risk. Because of a stay pending appeal entered by this court, however, the return has not been carried out, and circumstances have changed materially. Most significantly, neither parent now resides in Mexico, and if the children are returned there, the Mexican court may no longer be able, practically or legally, to resolve the custody dispute between two American parents over their American children. Under our precedent, that potential inability of the foreign court to resolve the custody dispute may pose "a grave risk" of "an intolerable situation" to the children.

A return order is premised on the risks at the time of the actual return, and the district court has not had a meaningful chance to evaluate, in light of the material change in circumstances, whether there is a "grave risk" under the Convention when the children would now be returned. In this unusual circumstance, a remand is warranted so that the district court may consider in the first instance whether returning the children to Mexico will now expose them to "a grave risk" of harm or of an intolerable situation.

I.

Mr. Steven Neumann sued his wife, Ms. Julie Neumann, seeking an order to return their three children to Mexico under the Hague Abduction Convention. The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Abduction Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, tries to solve the jurisdictional problem that arises when one parent, often during a marital dispute, internationally distances the marital children from the other parent. The U.S. Congress has implemented the Convention, and has adopted the Convention's aims, in the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C. §§ 9001–11. When the children's removal violates the distanced parent's custodial rights under the laws of the children's country of habitual residence, the Convention generally requires member states to return the children, so that the proper court may adjudicate custody over the children. Hague Abduction Convention, art. 1; 22 U.S.C. § 9001(a)(4). "That rule . . . was designed to protect the interests of the state of habitual residence in determining any custody dispute, and to deter parents from unilaterally removing children in search of a more sympathetic forum." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (citation omitted). "The driving objective of the [Convention] is to facilitate custody adjudications, promptly and exclusively, in

the place where the child habitually resides." *Chafin v. Chafin*, 133 S. Ct. 1017, 1028 (2013) (Ginsburg, J., concurring).

Consistent with the aims of the Convention, this court, when faced with the claim under ICARA that a parent has wrongfully removed children from their country of habitual residence, limits its adjudication to the abduction claim. It does not adjudicate the merits of any underlying custody dispute. *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1063 (6th Cir. 1996). However, importantly for this case, return need not be ordered where "there is a grave risk that [the] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable position." Hague Abduction Convention, art. 3.

The Neumanns had been living in Michigan for more than a decade when they moved to Mexico. After nearly four years in Mexico, during which the three children attended school there and made friends there, Ms. Neumann fled the country to Michigan with them, leaving her husband behind. Just days before Ms. Neumann left Mexico with the children, Mr. Neumann had been drinking heavily again and, while arguing, had pushed Ms. Neumann across the kitchen, leaving her with three broken ribs.

Julie Neumann and Steven Neumann were married in 1997. They have three children: JMN, JSN, and MKN. JMN, a daughter, was born in 1999. JSN and MKN, both sons, were born in 2002 and 2003.

From June 2000 to February 2011, the Neumanns lived in Michigan. In February 2011, the Neumanns moved to Mexico because Mr. Neumann's employer, Ford Motor Company, assigned him to a new job there. Initially, Mr. Neumann's assignment in Mexico was scheduled to expire in 2014. But sometime in 2014, Mr. Neumann's assignment was extended to 2017. The Neumanns had not decided where to live after that extended assignment. Ms. Neumann has

agreed that she was "indecisive" about where they would live. They lived together in Mexico until December 28, 2014, when Ms. Neumann left Mexico with her three children and returned to Michigan.

While they lived in Mexico, the children settled into their new life. They attended the same school, an English-speaking international school, for nearly four years. At school, they participated in school plays and concerts. They made new friends. And while they frequently vacationed in Michigan when school was not in session, and may have considered Michigan to be their home, they planned to stay in Mexico for at least another year, and potentially indefinitely.

Those plans were interrupted in December 2014. The day after Christmas, Mr. and Ms. Neumann had a violent dispute that left Ms. Neumann with three broken ribs and on a plane back to Michigan with the three children. Mr. and Ms. Neumann dispute the details of that incident, with the three children largely confirming Ms. Neumann's story.

According to Ms. Neumann, Mr. Neumann had drunk heavily on Christmas Eve and Christmas Day, to the point where he "had fallen . . . in the bathroom doorway," "screaming [for] help," claiming that he was "bleeding all over," yelling at Ms. Neumann, and calling her "a stupid F'ing bitch, a good-for-nothing bitch." Mr. Neumann admits he "[p]robably" had "too much to drink" on Christmas Day 2014, but not on Christmas Eve. Mr. and Ms. Neumann agree that while Mr. Neumann was in that "intoxicated condition," on Christmas Day, Ms. Neumann took photographs and videos of him. Ms. Neumann explains, "I felt that maybe if he heard the way he talked to me when he was drunk, he would know how much he was hurting me." Mr. Neumann did not find out about the photographs and videos until the morning after, when Ms. Neumann showed him how Mr. Neumann was when he was drunk.

According to Mr. Neumann, he then "asked" Ms. Neumann for the phone, so that he could delete the photographs and videos, which he "fear[ed] she would post . . . [on] social media." They "argued," "raising [their] voices," until Mr. Neumann "grabbed the phone from her hand" and "ran up the stairs . . . into the bedroom," because Ms. Neumann was "striking [him] with her closed fist" and "punching [him]" in the back. Mr. Neumann then deleted the photos and waited for an hour "to let things cool off." When he came out and went to the kitchen "to make a cocktail," Ms. Neumann, who was with JMN, "put her hand on the vodka bottle" and "an argument started." Mr. Neumann alleges that Ms. Neumann "raised a frying pan" and "struck" him "on the side of the head and then . . . on the top of the head." Mr. Neumann "grabbed a knife" from a "butcher block" and "held it up." Ms. Neumann "was taunting" him, and she "spat upon" him and asked him "go ahead, what are you going to do, you good for nothing drunk?" Then Mr. Neumann "heard" the children behind him, who were screaming at him "to stop." The children—JMN and JSN—were "on [his] arm after [he] raised the knife." Mr. Neumann "dropped" the knife. He then "pushed" Ms. Neumann, as he says, "out of my face." Ms. Neumann then "flew and hit the counter." Mr. Neumann returned to the bedroom "to cool off" and "stayed there for a couple of hours," and when he returned to the kitchen, "they were missing, gone."

According to Ms. Neumann, that morning, Mr. Neumann went out to the terrace to smoke a cigarette. When Ms. Neumann followed him to the terrace, before she said anything, he "started saying in all different crazy tones and voices F you, F you, like he was crazy out of his mind." She suspected that he was still drunk from the night before. She then showed him the recordings of the previous night because she "knew he didn't remember it" and wanted him to "know how much he was hurting [her] when he dr[a]nk so much." Upon seeing the recordings,

Mr. Neumann "told" Ms. Neumann to delete them, and when Ms. Neumann refused, "he starting screaming." Then Ms. Neumann returned into the house with the phone and made a sandwich for Mr. Neumann, so that he would sober up. The children returned to the house and pleaded with Mr. Neumann to stop drinking. Mr. Neumann finished his sandwich and went upstairs. When he returned, Ms. Neumann was in the kitchen. He began "hitting" Ms. Neumann and "grabbing" her arm, in trying to take the phone away from her, and "pushed" her, which led to her "flying" from the kitchen to the dining room table. Ms. Neumann grabbed a frying pan and "swung it at him," but did not hit him. Mr. Neumann then went back upstairs to the bedroom and locked the door. Ms. Neumann followed him and opened the door with a key. Mr. Neumann "threw the phone on the bed" and Ms. Neumann heard him go to the basement. According to Ms. Neumann, JMN, the eldest child, was telling her younger brothers to "go and pack a bag," because they "had to get out of there," because "it wasn't safe," and "dad was going to kill mom." After about an hour, Mr. Neumann returned from the basement, and when JMN approached him, called her "ungrateful" and told her "to get out of his life." By this time, Mr. Neumann was back in the kitchen. Ms. Neumann approached him to tell him that it was "bad enough" that he was hurting her, but that he had "to stop hurting the children." Mr. Neumann, in response, "grabbed the knife that he had cut his food with" and held "the knife to [Ms. Neumann's] neck," "screaming." Ms. Neumann "heard the kids screaming." Then she saw the knife "go flying" and Mr. Neumann "threw" her and she "landed" on a wooden chair. She thought her back was "broken." When she stood up and exclaimed that she thought her back was broken, he said "good for you, you lousy bitch, you deserve worse."

Ms. Neumann left Mexico with the children on December 28, 2014. Before she left, according to Ms. Neumann, Mr. Neumann allegedly threatened to kill her over the phone. In the

United States, a hospital determined that Ms. Neumann had three broken ribs, ribs ten to twelve. She has been diagnosed with PTSD. Mr. Neumann reports that he "wonders about the injury."

The three children have spoken to a court-appointed expert about the incident, and they largely confirm Ms. Neumann's story. JMN, the eldest child, confirmed that Mr. Neumann held "a sharp steak knife at [Ms. Neumann's] throat" and that she and her brother JSN "pulled [Mr. Neumann] off [Ms. Neumann]." JMN added that she and her brothers were "trembling" because they were "real scared." JSN, the middle child, stated that Mr. Neumann "tried to stab" Ms. Neumann, that he pushed her and caused her injury, and that he and JMN "pulled [Mr. Neumann] off [Ms. Neumann], he had a knife, he pushed her down." JMN added that he was "scared and nervous." MKN, the youngest child, did not report those details to the court-appointed expert, but did say that on that day, his father "screamed at everybody" and told them to get out of the house.

Mr. Neumann admits he is an alcoholic, and the district court agreed with its appointed expert that Mr. Neumann's alcoholism was "untreated." The court-appointed expert concluded in particular that Mr. Neumann faces a "clear risk of relapse," and because Mr. Neumann has suffered "destructive relapses" with binging on alcohol, the expert also concluded that Mr. Neumann's clear risk of relapse threatens "significant results" to the children.

Mr. Neumann has admitted to two drunk-driving convictions, in 1992 and 1994, for which he was "jailed and detained." Mr. Neumann has been physically violent with his children before, but not as severely as he was violent with Ms. Neumann. JSN, the middle child, reported to the court-appointed expert that Mr. Neumann would "slap [him] on the head for no reason, just a smack." Now, JSN reports, he "flinch[es] from that if someone puts up their hand."

The children all report that Mr. Neumann is angry, abusive, and frequently drunk. JMN, the oldest child, called him "mentally abusive, both to her mother and to her and her brothers." According to her, Mr. Neumann would "come[] home from work angry," would "yell[] at" them, and would "wake up from a dead sleep and yell at [them] for absolutely no reason." JSN, the middle child, characterized Mr. Neumann as "a very angry person" with "a short temper," who "would play mind games" with him, and who "had a bad drinking problem" to the point that he couldn't walk straight or "speak right." MKN, the youngest child, similarly stated that Mr. Neumann "always drank too much, swore at [them], then the next day apologized but it kept happening."

Mr. and Ms. Neumann both filed for divorce. Mr. Neumann filed in Mexico on May 11, 2015. Ms. Neumann filed in Michigan on May 12, 2015. Mr. Neumann and Ms. Neumann agree on appeal that the Mexican court entered a unilateral divorce, as Ms. Neumann did not appear.

The district court below conducted a four-day evidentiary hearing on whether the children had been wrongfully removed and whether Ms. Neumann could raise an affirmative defense to their return. The district court also appointed a psychologist to examine the three children.

In August 2015, Dr. Haynes concluded that Mr. Neumann's alcoholism was "essentially untreated." Dr. Haynes opined that, if Mr. and Ms. Neumann were to cohabit as they continue their divorce, that cohabitation would subject Mr. Neumann to "the greatest stress and the greatest risks" in these relative circumstances. Observing that when children witness spousal violence, as JSN and MKN did, "some mental health intervention is necessary with the children and the parent prior to reunification," Dr. Haynes further opined: "It would appear strongly

undesirable to require reunification of family members who have been living separately for approximately eight months without this professional intervention work." Dr. Haynes further explained that the children "have expressed feelings of apprehension regarding reunification with their father" and "say they feel unsafe." Dr. Haynes concluded, "there are multiple significant risks of different kinds" in returning the children back to Mexico. And while Dr. Haynes did not diagnose the children with PTSD, although Ms. Neumann's expert previously suggested the children did suffer from PTSD, Dr. Haynes warned that the children are "upset about the father's behavior in the family, and this needs to be professionally addressed."

In a supplemental report in November 2015, Dr. Haynes largely reiterated those findings. While Dr. Haynes noted "mild improvement" in the children's psychological health, he also stated that "all three children continue to be strong and firm about not wanting to return to Mexico at this time," and "[a]ll three children equally express apprehension of going to Mexico." Dr. Haynes concluded: "From a psychological standpoint, it would be inappropriate, anxiety-producing, and unwise for the children to be . . . physically split up . . . . At this point all three would view going to Mexico as a highly coercive action against their will and against their intent, regarding which they have significant fears, repetitively addressed with Dr. Ceresnie in psychotherapy." He also concluded: "In my opinion, the children being with the father unsupervised, such as in Mexico, at this point reflects psychological risk because of his essentially and continuing untreated alcohol abuse problem, now in the added context of divorce and its controversies, stressors, and intensities."

The district court also interviewed the three children individually, in chambers, with only one law clerk present. The district court reported that, during the interview, "the children did not identify any significant concern about returning to Mexico." Furthermore, according to the

district court, the children "expressed no fear of any harm, such as physical violence or psychological distress, to which they might be subjected or exposed by their father or by anyone else."

The district court ruled that the children's return to Mexico was required by the Convention. The court first determined that Mexico was the country of habitual residence of the children, largely because the children had spent nearly four years in Mexico, during which they attended school there, made friends there, and engaged in extracurricular activities there. Determining also that Ms. Neumann violated Mr. Neumann's exercised custodial rights under Mexican law when she took the children to the United States, the district court concluded that the children had been wrongfully removed. The court then rejected Ms. Neumann's affirmative defenses, concluding in particular that she had not proven, by clear and convincing evidence, that the children faced a grave risk of harm upon their return to Mexico. As the court explained, while Mr. Neumann's alcoholism remained untreated, it did not pose a physical danger to the children, because there was no evidence that it ever previously resulted in severe neglect of the children, and because the children to be returned—JSN and MKN—are as young teenagers "in many ways, self-sufficient and can manage most of their basic needs without significant supervision." The court also explained that "[Mr. Neumann's] alcohol dependency, and any consequential effect on the children, will be something for the court that makes the custody determination to consider." The court similarly dismissed other proffered risks as tied not to a return to Mexico, but more specifically to a return to Mr. Neumann's custody.

Because JMN turned sixteen years old while this action was pending, the Hague Abduction Convention no longer applies to her, Hague Abduction Convention, art. 4, and the

district court ordered Ms. Neumann to return only JSN and MKN to Mexico. The district court declined to order JSN and MKN into Mr. Neumann's custody—just back to Mexico.

In ordering Ms. Neumann to return the two children to Mexico, the district court did not address the many accompanying logistics. While the court ordered Ms. Neumann "to make whatever arrangements are necessary to effectuate the [return] order . . . , including securing valid and up-to-date passports," and further ordered Mr. Neumann "to execute and transmit to [Ms. Neumann] whatever documents are necessary for [Ms. Neumann] to secure passports and any other documents necessary for the children's travel to Mexico," the court did not address who would greet the children at the airport in Mexico and who would take care of them pending a resolution by the Mexican court of temporary custody and then custody. The court likely omitted such guidance because the parties failed to agree to even what the logistical issues were that remained to be resolved. As the district court explained on June 6, 2016:

> With regard to [the place where the children will be upon return], again that's an issue of custody and what's a fit and proper place for the children to be. I think both parents as well as the children will be better off if they get in front of some judge who can start making rulings about how these children's lives are going to be handled as we move forward in time. Right now, there's very little that these two parents can agree on and that's unfortunate for them, it's unfortunate for their children, but we've got to decide what we can decide, what we should decide and for me to try to decide what is an appropriate location I think is beyond what I'm supposed to be doing under the Hague Convention. Now if somebody thinks otherwise, wants to file some kind of motion, give me some authority, I'm not barring that, but from what I've heard up to this point, I'm not of the view that I need to micromanage precisely where these children are going to live in Mexico. I think everyone would be better off getting in front of a judge who can make a custody decision and that judge can decide if Durango or some other location is the appropriate location in which these children should be residing.

Ms. Neumann moved to stay the return order pending appeal. The district court held a hearing on the motion and then denied it. The district court reasoned that the four-factor stay analysis did not warrant a stay, because Ms. Neumann had not shown a substantial likelihood of success on the merits, because the case had already been delayed some time, and because the

public interest did not favor a stay. Ms. Neumann then filed an emergency motion in this court, seeking a stay of the district court's return order. A panel of this court granted the motion in a brief order. The children therefore remain in Michigan pending the resolution of this appeal.

On December 1, 2016, we heard oral arguments. Mr. Neumann's counsel represented to the court that in November 2016—six months after the district court's return order—Mr. Neumann returned indefinitely to Michigan after a job reassignment. The counsel also represented to the court that while Mr. Neumann's stay in Michigan is indefinite, Mr. Neumann may be assigned to a job in India, too. Counsel further represented that if this court were to affirm the district court's return order, Mr. Neumann would return to Mexico to receive the children.

As things now stand, the children, Mr. Neumann, and Ms. Neumann are all in Michigan. Ms. Neumann and the children have been there for more than two years—since December 2014. Mr. Neumann has been there for about five months—since November 2016. When the district court ordered Ms. Neumann to return the children to Mexico, Mr. Neumann was residing and working in Mexico, potentially giving the Mexican court the jurisdiction over the custody dispute. Under those circumstances, the district court concluded that returning the children would not expose them to a grave risk of harm or of an intolerable situation. But those circumstances have now changed substantially.

On appeal, Ms. Neumann has raised two issues. She argues that the district court clearly erred in concluding Mexico to be the children's country of habitual residence. She also argues that the district court erred in determining that returning the children to Mexico would not expose the children to a grave risk of physical or psychological harm.

II.

The district court did not clearly err when it found Mexico to be the country of habitual residence of JSN and MKN. When Ms. Neumann took them to the United States, JSN and MKN had been living in Mexico for nearly four years—from February 2011 to December 28, 2014. That was plainly long enough for JSN and MKN to acclimate to their new life. JSN and MKN attended the same school in Mexico for nearly four years. At the school, they made new friends and engaged in extracurricular activities like school plays and concerts. The Neumanns also planned to continue to live in Mexico until 2017—maybe longer. Given those settled ties to Mexico, the district court did not clearly err in concluding that Mexico was the children's country of habitual residence.

"[A] child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). To determine whether a child has that sense of settled purpose in the new country, we examine various aspects of the child's activities in that country, including social engagement and extracurricular programming. *See Robert*, 507 F.3d at 996 (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 293–94 (3d Cir. 2006)); *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (quoting *Robert*, 507 F.3d at 996). Most importantly, because "academic activities are among the most central . . . in a child's life," a child's continued schooling in the new country is "highly suggestive of acclimatization." *Robert*, 507 F.3d at 996 (internal quotation marks omitted) (quoting *Karkkainen*, 445 F.3d at 293).

This court's habitual-residence analyses in *Robert* and *Jenkins* support the district court's conclusion. In *Robert*, this court reasoned that a ten-month stay in one country with sustained schooling and family excursions sufficed to create a new habitual residence, but that a three-week stay in another country did not. *Robert*, 507 F.3d at 997. In *Jenkins*, this court reasoned that a six-month stay in a new country sufficed to create a new habitual residence, in light of continued schooling and other regular activities in the new country. *Jenkins*, 569 F.3d at 552–53, 556–57. Here, JSN and MKN attended school in Mexico and engaged in various extracurricular activities there, much as the children in *Robert* and *Jenkins* did in their habitual residences. Furthermore, JSN and MKN lived in Mexico for nearly four years—much longer than the ten months and the six months that sufficed to establish a new habitual residence in *Robert* and *Jenkins*, respectively. JSN and MKN had settled into their lives in Mexico; Mexico was their habitual residence in December 2014.

Ms. Neumann's arguments to the contrary are unconvincing. She argues that the stay in Mexico was temporary, because the Neumanns maintained a home in Michigan during most of their stay in Mexico, and because they began looking for a new home in Michigan when they sold their old home in February 2014. But she herself has stated that they had plans to stay in Mexico until 2017, and that they did not have plans to go anywhere thereafter, intending to "cross that bridge when [they] came to it." In any event, Ms. Neumann's intentions per se are irrelevant; what matters is "the child's perspective." *Robert*, 507 F.3d at 993 (quoting *Feder*, 63 F.3d at 224). Furthermore, "habitual residence must not be confused with domicile," which requires the intent permanently to remain. *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1401 (6th Cir. 1993). Unlike an inquiry into a child's domicile, an inquiry into the child's habitual residence "examine[s] past experience, not future intentions." *Id.* The past experience

of JSN and MKN, in December 2014 and from their perspective, was nearly four years of continued schooling and socializing in Mexico, with no definite plans to live elsewhere.

Ms. Neumann also argues that the children's school in Mexico was an English-speaking international school and that their friends were not Mexican citizens. That is true, but that does not undermine the conclusion that the children's academic and social lives had been, for nearly four years, in Mexico. Relatedly, she argues that the children maintained strong ties to Michigan throughout their four-year stay in Mexico. The children did frequently vacation in Michigan during school breaks and may have considered Michigan their home. But, in December 2014, for nearly four years they had attended school in Mexico, not Michigan, and they had based their social and extracurricular activities in Mexico, not Michigan. Even if Michigan was their home state, by December 2014, JSN and MKN had firmly settled into their new habitual residence in Mexico.

III.

Because Mexico was the country of habitual residence of JSN and MKN, and because the parties no longer dispute that Ms. Neumann violated Mr. Neumann's custodial rights under Mexican law when she took her children to the United States on December 28, 2014, Ms. Neumann has wrongfully removed JSN and MKN under the Hague Abduction Convention. Hague Abduction Convention, art. 3. The district court therefore was bound to order Ms. Neumann to return the children back to Mexico, *see id.*, art. 12, unless Ms. Neumann proved an affirmative defense. Ms. Neumann argues on appeal, as she argued below, that, by clear and convincing evidence, returning the children to Mexico would expose the children to a grave risk of physical or psychological harm or an otherwise intolerable situation.[1] The district court

---

[1] Contrary to Mr. Neumann's arguments, Ms. Neumann has not forfeited this affirmative defense. Even though Ms. Neumann did not plead this affirmative defense in her answer to Mr. Neumann's complaint, the "failure

rejected that argument and ordered JSN and MKN back to Mexico. In light of new developments, we do not decide whether the district court correctly decided, based on then-current circumstances, the close issue of whether returning the children to Mexico presented a grave risk of physical or psychological harm. The closeness of the issue, however, does make a remand more advisable.

The district court's harm analysis depended on the circumstances in which the children would have lived when they returned to Mexico. However, while the district court ordered the children to Mexico generally, the court did not order how the children would be returned, where they would temporarily live, and who would temporarily take care of them, pending the Mexican court's custody determination. It is therefore uncertain what compliance with the district court's order would have looked like.

"Grave risk" must be shown by clear and convincing evidence, 22 U.S.C. § 9003(e)(2), and it is a risk that is more than "serious," but not necessarily "immediate." *Simcox*, 511 F.3d at 605 (quoting *Friedrich II*, 78 F.3d at 1068). In *Simcox*, we held that the removing parent had met the burden of establishing a grave risk of harm, but commented that the issue was "close." *Simcox*, 511 F.3d at 609. This case bears similarities to *Simcox*, but there are differences in both directions. In *Simcox*, the children "expressed fear of their father and recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of pulling their hair and ears." *Id.* at 599. But the father "downplay[ed] the seriousness of this 'discipline.'" *Id.* Here, the children reported some physical abuse, but less frequent, less serious slaps on the head. The children also uniformly reported some verbal abuse; they say Mr. Neumann would often yell at

---

to raise an affirmative defense by responsive pleading does not always result in waiver." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993). It does not result in waiver "if a plaintiff receives notice of an affirmative defense by some means other than pleadings." *Id.* (quoting *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989)). Here, not only did Mr. Neumann receive notice of this affirmative defense, but he also briefed the issue at the district court, following Ms. Neumann's briefing on the issue.

them, for insignificant reasons or for no reason at all. In *Simcox*, the children also reported their father's repeated abuse of their mother. According to them, the father called the mother a "f— ing bitch" and "a c—," and the father on one occasion "put his finger on her neck, pulling hair." *Simcox*, 511 F.3d at 599. Here, the children do not report a consistent abuse of Ms. Neumann, but they did witness the events of Christmas 2014, when they say Mr. Neumann pulled a knife on Ms. Neumann, held the knife to her throat, and pushed her in a way that left Ms. Neumann with three broken ribs. JMN and JSN had to pull their father off their mother. In *Simcox*, the mother's expert concluded that most of the children were generally suffering from "some level of post-traumatic stress disorder." *Simcox*, 511 F.3d at 608. Here, Ms. Neumann's expert also concluded that the children were suffering from PTSD, but the court-appointed expert did not diagnose PTSD and cautioned instead that the children continue to suffer psychological trauma from the incident that needs to be "professionally addressed." Faced with the facts in *Simcox*, we held that there was "grave risk," but we nevertheless indicated that returning the children might be appropriate if sufficient "undertakings" could be made to provide for their safe return. *Simcox*, 511 F.3d at 610–11.

It is a close issue whether, in light of *Simcox*, the district court correctly found that Ms. Neumann had failed to prove a grave risk of harm by clear and convincing evidence. On the one hand, the father's physical abuse of the children was more serious and more frequent in *Simcox* than here. On the other hand, the severity of the Christmas 2014 incident exceeds the severity of any specific event in *Simcox*, and Mr. Neumann at the time of the district court's order suffered from untreated and destabilizing alcoholism with a "clear risk of relapse," which threatens "significant results" to the children.

As in *Simcox*, *see* 511 F.3d at 604, the district court in this case privately interviewed the two young teenagers without counsel being present, and off the record. Such a procedure better enabled the district court to determine the true extent of the risk to them than the cold record that we face.

Because the circumstances of the return will no longer be as they were contemplated when the district judge ruled, and because a remand is required in any event as explained below, we do not resolve whether the district court properly found no clear and convincing evidence of physical or psychological harm at the time the court ordered the children's return to Mexico. On remand, the district court may in its discretion take further evidence as to, for instance, whom the children will be staying with in Mexico during custody proceedings, and how Mr. Neumann has dealt with his alcoholism.

## IV.

Because neither parent currently resides in Mexico, we face the independent question of whether there is a grave risk of an intolerable situation upon return to Mexico, arising from possible impediments to the ability of Mexican courts to adjudicate custody. In *Pliego v. Hayes*, 843 F.3d 226, 228–29 (6th Cir. 2016), we held that "where custody cannot be practically or legally adjudicated in the state of habitual residence," there may be "'grave risk' that the child's return would 'place the child in an intolerable situation.'" Here, if Ms. Neumann follows the district court's order to return the children to Mexico without any specified logistical agreements, it may not be possible for custody to be practically or legally adjudicated in Mexico. The record does not show whether a Mexican court may exercise jurisdiction to resolve a custody dispute between two American parents over two of their three American children, all of whom are American citizens, none of whom are Mexican citizens, and none of whom reside in Mexico. In

*Pliego*, we recognized that if diplomatic immunity prevented the state of habitual residence from adjudicating custody, that could be an intolerable situation under the Convention, in light of the underlying purpose of the Convention to have the state of habitual residence adjudicate custody. *See Pliego*, 843 F.3d at 233. In doing so, we also relied on foreign cases that reasoned that there was a grave risk of an intolerable situation where, for instance, a parent could not legally travel to the country that would have determined custody, *id.* at 234 (citing *Chan v. Chow*, 199 Dominion Law Reports 4th 478, paras. 59, 65–66 (Court of Appeals for British Columbia, Canada, 2001)), or the parent could not legally represent his or her interest and the child's interest in the subsequent litigation, *id.* (citing *State Central Authority of Victoria v. Ardito*, (unreported, Family Court of Australia, Joske, J., 29 Oct. 1997)). Similarly, if Mexico as a practical or legal matter cannot or will not adjudicate custody, the intolerable situation exception to the obligation to return may apply. The issue is presented by the intervening change of facts, and should be addressed by the district court in the first instance.

It cannot successfully be argued in response that the exception for grave risk is necessarily determined at the time of the return order rather than at the time of the actual return, when there is appreciable distance between the two. The official commentary to the Hague Abduction Convention explains that the grave-risk exception "clearly derive[s] from a consideration of the interests of the child" and concludes: "the interest of the child in not being removed from its habitual residence . . . gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Elisa Perez-Vera, Explanatory Report ¶ 29, in 3 *Hague Conference on Private International Law*, *Acts and Documents of the Fourteenth Session, Child Abduction* 1069

(1982)[2]; *see also Simcox v. Simcox*, 511 F.3d 594, 604 n.3 (6th Cir. 2007) (explaining that the report is the official commentary). That primary interest in protecting the child from danger or an intolerable situation can only be served if courts consider the dangers that the child will actually face upon return, as opposed to some counterfactual dangers that the child would have faced if he had been returned beforehand.

When, as here, material facts underlying the district court's judgment have changed during the appeal, appellate courts have remanded the case to the district court for further proceedings. In *McLeod v. General Electricity Co.*, 385 U.S. 533, 535 (1967), the Supreme Court determined, when parties to a labor dispute reached a collective bargaining agreement after the opinions of the district court and the court of appeals, that the "District Court should determine in the first instance the effect of this supervening event upon the appropriateness of injunctive relief." In *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427 (6th Cir. 2014) (en banc) (per curiam), we, too, have similarly sent back a case to the district court with a general remand, explaining that "[l]egal, factual, and equitable considerations ha[d] developed significantly since the district court denied the plaintiffs' request for a preliminary injunction almost two years ago," *id.* at 428, where the plaintiffs were challenging an emergency manager's elimination of the health benefits of the retired employees of a money-strapped city, but during appeal, the state had stripped the emergency manager of the power to do so, only to give that power back, and the emergency manager had issued another order eliminating the health benefits in the same way, *id.* at 429–30. Other circuits have similarly remanded district court orders for further consideration in light of intervening changes to material facts. *See Gen. Elec. Co. v. Local Union 191*, 443 F.2d 608, 610 (5th Cir. 1971); *Firestone Synthetic Rubber*

---

[2] Available at https://assets.hcch.net/upload/expl28.pdf.

*& Latex Co. v. Potter*, 400 F.2d 897, 898 (5th Cir. 1968); *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972).

Of course when appellate courts remand an appeal from a decision ordering injunctive relief, there is the danger that ever-changing factual predicates may result in an endless series of appeals and remands. *See generally* Stuart Benjamin, *Stepping into the Same River Twice: Rapidly Changing Facts and the Appellate Process*, 78 Tex. L. Rev. 269 (1999). Such a concern is outweighed in this case, however. First, as explained above, the right to relief is tied closely by the applicable law to the factual situation at the time the order is complied with. Second, the factual change goes to the core reason for relief: adjudication of custody by the state of habitual residence.

Third, the time for changes in circumstances to occur was extended in this case by the grant of a stay pending appeal. The Hague Abduction Convention declares its object to be to arrange a "prompt" return of wrongfully removed children. Hague Abduction Convention, art. 1. That purpose has been frustrated to some extent in this case by the appellate stay. The district court entered its order on May 16, 2016, to return the two younger children to Mexico. Ms. Neumann sought a stay of that order, which the district court set for hearing and which the court rejected on June 29, 2016. Because of the stay motion below, and the emergency stay motion here, the district court stayed the return for another month—until July 27, 2016. *See Neumann v. Neumann*, No. 15-CV-1195, 2016 WL 3661907, at *1 (E.D. Mich. July 11, 2016). While this court expedited its review of this case, on July 15, 2016, Ms. Neumann filed an emergency motion to stay the return order. On July 22, 2016, a panel of this court issued a stay pending appeal. We heard oral argument on December 1, 2016. It is now more than half a year since the

children would have been returned in the absence of our stay. In many cases that would not be enough time for circumstances to change appreciably, but certainly they did in this case.

V.

We uphold the district court's holdings that Mexico was the country of habitual residence of JSN and MKN, and that Ms. Neumann violated Mr. Neumann's custodial rights under Mexican law when she took her children to the United States on December 28, 2014. Our remand is otherwise general. The district court should determine whether or not clear and convincing evidence shows that returning the children now presents a "grave risk" of "physical or psychological harm" or "an intolerable situation." If so, then the district court has discretion to deny return, or to grant return subject to undertakings that would substantially lessen the risk. *See Simcox v. Simcox*, 511 F.3d 594, 604–11 (6th Cir. 2007). If the court determines that there is not a sufficient showing of a grave risk, the court should order return.

Should the district court decide that a return order is indeed required, such a return order should provide sufficient practical detail so that return can be accomplished promptly without further appreciable litigation delay. We explained in *Simcox* that even if the district court finds no affirmative defense to the return order, that court may still "deal with ordinary logistical considerations that frequently accompany the return of any child." *Id.* at 607 n.5. "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (alteration in original) (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)).

The district court's return order is vacated, and the case is remanded for further proceedings consistent with this opinion.

MARTHA CRAIG DAUGHTREY, *concurring in part and dissenting in part*.

Had the district court's opinion been allowed to stand as originally filed, JSN and MKN—the two younger Neumann children who were ordered to be returned to Mexico—would clearly have faced an "intolerable situation." For one thing, the district court failed to enter any specific orders concerning their return, directing only that they were to go to Mexico on a certain date, but *not* back to their father, and that their mother was to arrange for their transportation to Mexico, but *not* necessarily accompany the children or supervise them there.[1] Because neither side of the family had relatives in or near Mexico City, and no other arrangements for their protection or supervision were made, one can only wonder about their care and safety upon arrival. The district judge ultimately determined that the 13- and 14-year-old brothers were not sufficiently mature to have their preference against returning to Mexico honored, but the court apparently considered them mature enough to manage on their own once they got there.[2]

The omissions in the district court's order are startling, to say the least. According to the Federal Judicial Center's publication on handling Hague Convention abduction cases, "[w]hen an order for the return of a child is made, courts should focus on enforcement, specificity, and the safety of the child" and "clearly state the mandated time, place, and details of the child's return."[3] District courts are advised to invoke "mirror-image orders," which "are entered in both the courts of the state hearing the petition and the courts of the child's habitual residence," or to

---

[1] Courts are not authorized by either the Hague Convention or the International Child Abduction Remedies Act (ICARA), 22 U.S.C. §§ 9001–9011, to order a parent to relocate to another country. *See Redmond v. Redmond*, 724 F.3d 729, 735 n.1 (7th Cir. 2013).

[2] Despite the district court's decision to reject the children's choice to stay with their mother, at another point in the opinion, the court concluded that "the two boys are of an age (13 and 14) where (*sic*) they are, in many ways, self-sufficient and can manage most of their basic needs without significant supervision," a finding that certainly evinces maturity. *See Neumann v. Neumann*, 187 F. Supp. 3d 848, 864 (E.D. Mich. 2016).

[3] Federal Judicial Center, *The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges*, 149–50 (2nd ed. 2015), http://www.fjc.gov/public/pdf.nsf/lookup/Hague-Convention-Guide-Second-Edition-2015.pdf/$file/Hague-Convention-Guide-Second-Edition-2015.pdf (hereafter cited as FJC Guide for Judges).

"direct counsel for the parent requesting return to obtain a safe harbor order from the courts of the habitual residence." The latter are "designed to avoid severe and immediate physical or psychological harm to the child as a result of the conditions of return" and may be required as a prerequisite of an order of return.[4] None of this was accomplished by the district court order in this case.

Fortunately for all concerned, we have now learned, through statements elicited at oral argument, that Steven Neumann is no longer in Mexico because his assignment from his employer ended some time last year. According to his attorney, he is now back in Michigan, apparently in Wayne County, as are Julie Neumann and all three children. Despite this fact, the majority presumes that even though "neither parent currently resides in Mexico," the children may be required to end up there, if the district court again rejects Julie Neumann's "grave risk" defense. I gather that this conclusion is based on an assumption that Mexico, as the country of their "habitual residence" in 2014, is the only jurisdiction in which the children's custody can be litigated under the Hague Convention. But that assumption is flat wrong. As the Ninth Circuit has noted:

> The Convention's principal remedy is the return of the abducted child. However, the Convention does not make clear to what country a child must be returned. The Preamble recites the Convention's goal as the return of children "to the State of their habitual residence." However, the actual text of the Convention is silent as to where the child should be returned. Article 12 merely provides that a wrongfully removed child should be "returned . . . forthwith."
>
> The Convention's official commentary reveals that this silence was intentional. *See* Elisa Perez Vera, Explanatory Report ¶ 110, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 459-60 (1982). The commentary explains that the Convention rejected a proposal that would have required a child to be returned to his habitual residence. *Id.* The Convention was concerned that such a proposal would prove "inflexible" when the petitioner moves from the State of the child's habitual residence post-abduction. *Id.* In other words, the Convention did not provide that

---

[4] FJC Guide for Judges 150–51.

a child be returned to his pre-abduction habitual residence if the petitioner had relocated to a different country. The Commentary states that the Convention intended that the child be transferred to the petitioner's new residence in these circumstances. *Id.*

The State Department's commentary on the Convention contains a similar discussion. "The Convention does not technically require that the child be returned to his or her State of habitual residence, although in the classic abduction case this will occur. *If the petitioner has moved . . . the child will be returned to the petitioner, not the State of habitual residence.*" Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10404 (Mar. 26, 1986).

*Von Kennel Gaudin v. Remis*, 282 F.3d 1178, 1182–83 (9th Cir. 2002) (citations omitted) (alteration in original) (emphasis added).

The admonition to return the children to their father and "not the State of habitual residence" creates an apparent legal impasse in this instance, given that the district court specifically *denied* return to the father. However, under the facts of this case, there is a solution to this dilemma, because the *Von Kennel Gaudin* opinion also holds that "[t]he Convention cannot be invoked when the petitioner moves permanently *to the same country* in which the abductor and the children are located." *Id.* at 1183 (emphasis added); *accord Witherspoon v. Orange County Dept. of Social Servs.*, 646 F. Supp. 2d 1176, 1182 n.2 (C.D. Cal. 2009), *March v. Levine*, 2006 WL 3805665, at *4 (M.D. Tenn. 2006). In other words, the case becomes moot if both parents are in the United States. *See Von Kennel Gaudin*, 282 F.3d at 1183 (citing *IRS v. Pattullo*, 271 F.3d 898, 901 (9th Cir. 2001), for the proposition that "[i]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal is moot and must be dismissed")); *see also Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) ("Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."

(quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Indeed, "[r]egardless of whether the parties raised the issue of mootness, 'our first inquiry on appeal must be whether this case is moot.'" *Id.* (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (*en banc*)).

Dismissal of this appeal as moot is not only the legally correct result in this case; it would also be the most efficient way to get the parties into the court in which their long-running custody dispute can finally be heard and resolved appropriately. Certainly, nothing can be gained, as the majority would have it, by a remand and an order to the district court to rehear the same evidence that ultimately must be presented in the Wayne County Circuit Court's Family Division.[5] If, however, the majority nevertheless insists on a remand, I would suggest that the district court first re-examine an issue that will *not* be replicated in state court, *i.e.*, the question of JSN's and MKN's objections to being returned to Mexico and/or to their father against their will.

The district judge interviewed the two younger children in chambers with only a law clerk present and determined that they had "a preference" to remain in Michigan but no actual "objection" to returning to Mexico, or any "fear of harm" from their father. Of course, we cannot know how subdued and polite the two children may have been in the presence of the judge and the absence of any supportive family members, but the record is replete with their statements to Dr. Haynes, to two different therapists, and to their mother's pastor regarding their fears about returning to Mexico and their apprehension that they would not be "safe" with their father—all of which the district judge discounted because the statements were made to "third-

---

[5] If Steven Neumann's petition had been dismissed by the district court based on grave risk of harm if the children were returned to their father, the custody and visitation decisions could have been finalized in Michigan over a year ago. Routing the custody determination back through the district court and possibly through the Mexican court system at this late date does nothing more than increase the stress that the Neumanns have been living under for years.

parties" and not "directly" to the judge in chambers. Moreover, the district court's determination that the two children had to be returned to Mexico because they expressed only a "preference" to live in Michigan and not an "objection" to returning to Mexico is not only belied by the record but is also an example of deciding a question of law on the basis of purely superficial semantics. In point of fact, the Text and Legal Analysis of the Hague Convention developed by the Department of State uses the terms interchangeably.[6]

The district court's alternative finding that the two children were not mature enough to make a decision about their residence, based on Dr. Haynes's report, also does not hold up. In a four-paragraph summary of his views on "the extent to which the minor children [c]an make mature decisions about returning to Mexico," Haynes indicates that "all three children continue to be strong and firm about not wanting to return to Mexico at this time" and that they appear to have made independent judgments and "come to their own views regarding . . . return to Mexico." He notes that "[f]rom a psychological standpoint, it would be inappropriate, anxiety-producing, and unwise for the children to be split up regarding the issue of Mexico [because] all three would view going to Mexico as a highly coercive action against their will and against their intent, regarding which they have significant fears" that are being "repetitively addressed in psychotherapy."

The sentence from this part of the Haynes supplemental report quoted by the district court—that "because of the boys' age, '(b)y definition their decisions and cognitive processes on such matters are not mature'"—may be no more than a recognition by an expert that an individual's "cognitive processes" are not fully mature until age 25. In his initial evaluation,

---

[6] In a paragraph explaining the limitations on the obligation of return entitled "Child's *preference*," the analysis provides: "The third, unlettered paragraph of Article 13 permits the court to decline to order the child returned if the child *objects* to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's *views*." 51 Fed. Reg. 10,494, 10,510 (1986) (emphasis added).

Dr. Haynes found that the three children should not be considered "equally mature" in making decisions about returning to Mexico, because JMN, at 16 years old, "is significantly more mature than the two boys." But the report does not indicate that the younger two children's decisions are intrinsically immature or should be disregarded.

In any event, JSN and MKN are now 14 and 15 years old, beyond the age when most children are permitted to express a preference in ordinary custody cases, and significantly older than the two Simcox children, ages 10 and 12, whose objections to being returned were honored by the district court in *Simcox v. Simcox*, 499 F. Supp. 2d 946, 952 (N.D. Ohio 2007) (*Simcox I*), *rev'd on other grounds*, *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007) (*Simcox II*). And, although the district judge in that case declined to consider the views of an eight-year-old Simcox child, the court nevertheless acknowledged that children as young as eight years old have been found of sufficient age and maturity to object to repatriation. *Id.*; *see also*, *e.g.*, *Anderson v. Acree*, 250 F. Supp.2d 876, 883–84 (S.D. Ohio 2002) (eight-year-old found to be of sufficient age and maturity); *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001) (same).

Finally, I cannot agree with the majority's decision to provide the district court with another opportunity to consider the question of "grave risk of harm" to the children if they are sent back to Mexico. It seems clear that Julie Neumann has already discharged her burden of proof in this regard. To begin with, the district court's decision to send JSN and MKN back to Mexico but not back to their father can be seen only as an implicit determination that the children's return even to Steve Neumann's temporary custody posed a grave risk of physical or psychological harm to them. In addition, the district court took what the record establishes as a compelling history of alcohol-fueled domestic abuse of their mother and portrayed it as nothing more than a he-said/she-said situation, using terminology such as "regardless of . . . which

version of the December 26 assaults is accepted" and "[e]ven assuming the children did physically intervene when Steven pinned Julie." *Neumann v. Neumann*, 187 F. Supp. 3d 848, 862 (E.D. Mich. 2016). In almost the same breath, the district court expressed its "conclusion that Steven was not a credible witness." *Id*. At that point, the mother's testimony about what occurred on December 26, especially given its corroboration by the children, should have been accorded the full credit that it deserved.

That testimony painted a stark portrait of domestic abuse, not the least part of which concerned Steven Neumann's severe but untreated alcoholism, which fueled not only his physical abuse of his wife on December 26, but played a significant role in at least two other physical assaults on Julie Neumann. At Thanksgiving in 2003, Steven Neumann "got real, real drunk" and started hitting her in the head as they drove home from dinner, necessitating a return to Steven Neumann's parents' house for help—Julie Neumann and the three children spent the night on the floor in the family room. In 2005, according to Julie Neumann's statement to Dr. Haynes, Steven Neumann "grabbed her and threw her against the wall of the kitchen and she hit her head, and did not know if she was knocked unconscious but [ ] she then realized she was on the kitchen floor." As for the events of December 26, the district court noted that Steven Neumann had been drinking on the two previous days when, in fact, the record shows that he had been drinking heavily since December 21, and before that on December 19 and 20, based on a record that he himself supplied as an exhibit. According to Dr. Haynes, Steven Neumann was not a social drinker or someone who simply enjoyed a glass of wine with dinner. Instead, he was a self-described alcoholic and "binge drinker," who would start drinking early in the day on weekends and would not, or could not, stop drinking once he began. He maintained that his drinking did not affect his work but admitted that it affected his relationship with his wife and

children—when drinking, he tended to lose his temper around the family, yelling and cursing at them. During Christmas week in 2014, Steven "was consuming a half gallon of gin, vodka, and tequila combined per day," and he "additionally consumed beer and wine," used Valium daily and "also sometimes Ativan." After Julie and the children fled from the house on December 26 and from the country on December 28, Steven Neumann's two brothers flew down to Mexico City on December 30 to check on him. At that point Steven had been drinking around the clock for four days in an effort, he later said, to "drink himself to death." His brothers flew Steven home to Michigan to get him admitted for treatment; he arrived at the rehab facility in an intoxicated condition and checked himself out two days later, "against medical advice."

Although the district court at one point referred to Steven Neumann's problem as "alleged untreated alcoholism," *id*. at 860, there is no question concerning what led up to his physical and verbal assaults on his wife on December 26. Moreover, the problem remained untreated at the time of the hearing, although Steven claimed to be under the care of a psychiatrist in Mexico and to have joined AA there. As it turns out, the physician in question was treating him for depression, not alcoholism, and Steven had been to only three AA meetings in three months. He also claimed that his mother in Michigan was acting as his "mentor" or AA sponsor—an impossibility under AA practice. Although he also claimed to be abstinent at the time of the hearing in the district court, Dr. Haynes predicted that without rehabilitation, Steven Neumann was headed for relapses that would get progressively worse, and that his "substance abuse and its implications" were the "central issue" in the family's dysfunctional situation.

In determining that the children did not face a grave risk of harm if returned to Mexico, the district court recognized that the issues of domestic abuse and Steven Neumann's untreated alcoholism were "interconnected," but then disaggregated them in assessing their impact on the

children's safety. For example, the court pointed to Steven's excessive consumption of alcohol and testimony from "the children and Julie indicat[ing] that Steven would have difficulty walking and would fall over, his speech would be slurred, and he would otherwise 'not be himself,'" but the court nevertheless found that "Steven's alcoholism d[id] not appear to pose a physical danger to the children." That conclusion is clearly refuted by the psychological evaluation that the court ordered, and then largely ignored. It is difficult to imagine how a parent who was frequently "falling-down drunk," if left in charge of three children, would not present a risk of both psychological *and* physical harm to those children.

As for the domestic violence committed against Julie, the district court found that the "the incident on December 26 has affected the children" but not to the extent that a "return to Mexico would subject the children to grave risk of purely psychological harm," noting that the PTSD the children exhibited immediately following their arrival in Michigan had dissipated by the time they were evaluated eight months later by Dr. Haynes. As the district court described the psychological report, it showed only that risk to the children was "significant," but not that it was "grave." Actually, the report indicated that in Dr. Haynes's judgment there were "multiple significant risks" that should be considered cumulatively, including:

- Steven's refusal to undergo substance abuse treatment, which "raise[d] a clear risk of relapse, with significant results not only to Steve but to the children and to Julie";

- the extraordinary stresses and risks caused by a contentious divorce;

- the fact that "there has been domestic violence, and it involved injury. Julie has been dealing with this, the children have been dealing with it. It is unclear that Steve has been dealing with it at this point";

- "The customary practice in . . . situations of spousal violence witnessed by the children is that some mental health intervention is necessary . . . prior to reunification of the children with the absent parent."[7]

---

[7] Dr. Haynes observed in his risk assessment that the "children have expressed feelings of apprehension regarding reunification with their father at this time. They say they feel unsafe." Nevertheless, "reunification" with

The district court's ultimate conclusion that Julie Neumann had failed to establish a defense was based on its determination that the "alleged abuse" in this case "was only psychological in nature, isolated and sporadic, and it is far from certain that it is likely to reoccur in the future." *Id*. at 866. Given this thoroughly superficial analysis, the only obvious certainty here is the district court's apparent lack of familiarity with the nature and significance of both alcoholism and domestic violence and their harmful effect on children.[8] In this case, the violence consisted of Steve Neumann, literally twice the size of his victim, pinning Julie Neumann against a kitchen counter with a knife to her throat, while two of the children pulled at his arm to get him away from her. As the knife clattered to the floor, Steven flung Julie away so violently that she fell against a chair and broke three of her ribs. If this were the only "incident" at issue in this litigation, it would be serious enough to create a defense to "wrongful removal" under the Hague Convention, because it was brutal, it involved two of the children directly and could have caused them injury, and it sent Julie Neumann to the hospital. Although the International Parental Kidnapping Act, 18 U.S.C. § 1204, makes the illegal removal of a child from the United States "with intent to obstruct the lawful exercise of parental rights" a felony, it also creates an affirmative defense if "the defendant was fleeing *an incidence* or pattern of domestic violence." 18 U.S.C. § 1204(a),(c)(2) (emphasis added).

There has been a movement to amend the Hague Convention to make fleeing from domestic violence for safety reasons a stand-alone defense to the return of an abducted child.

---

his children was attempted by teleconference. During the meeting, Steven blew up and "fired" the children's therapist, who had been treating them for some time and was in the room with them at the time of the teleconference.

[8] There are a number of Hague Convention cases in which courts have recognized that even though violence by a parent is not directed toward a child, damage to the child can result. *See, e.g.*, *Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (11th Cir. 2016); *Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012).

There have also been efforts to revise the convention so that such flight is not a "wrongful removal" in the first place. As Judge Richard Posner pointed out in *Khan v. Fatima*:

> The [Hague] Convention was created to discourage abductions by parents who either lost, or would lose, a custody contest. . . . The Convention drafters adopted a 'remedy of return' . . . to discourage abductions, reconnect children with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed. [But] while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence.

680 F.3d 781, 783–84 (7th Cir. 2012) (internal quotation marks omitted) (alterations in original) (quoting Merle H. Weiner, "Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction," 33 Colum. Human Rts. L. Rev. 275, 278–79 (2002) (citations omitted); also quoted in *Van De Sande v. Van De Sande*, 431 F.3d 567, 568 (7th Cir. 2005)). *See also* Karen Brown Williams, "Fleeing Domestic Violence: A Proposal to Change the Inadequacies of the Hague Convention on the Civil Aspects of International Child Abduction in Domestic Violence Cases," 4 John Marshall L.J. 39, 42–45 (2011); Noah L. Browne, Note, "Relevance and Fairness: Protecting the Rights of Domestic–Violence Victims and Left–Behind Fathers Under the Hague Convention on International Child Abduction," 60 Duke L.J. 1193, 1202–05 (2011); Roxanne Hoegger, "What If She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy," 18 Berkeley Women's L.J. 181, 187–88 (2003); Merle H. Weiner, "International Child Abduction and the Escape from Domestic Violence," 69 Fordham L. Rev. 593, 634 (2000).

Perhaps the seminal case in this country dealing with domestic violence under the Hague Convention is *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000), in which the court noted that "both

state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser." The court also pointed to a congressional resolution, passed in 1990, recognizing that "the effects of physical abuse of a spouse on children include the potential for future harm where contact with the batterer continues" and that "children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of a parent." *Id.* (alterations omitted) (quoting H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990)). The *Walsh* court concluded that "[t]hese factors are sufficient to make a threshold showing of grave risk of exposure to physical or psychological harm." *Id.*

Perhaps the leading case in this circuit on domestic violence under the Hague Convention is *Simcox v. Simcox,* in which we observed that "the Convention's purposes would not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence." 511 F.3d at 605 (citation and alterations omitted). The five children in that case "expressed fear of their father" caused primarily by his severe forms of physical "discipline" of his children, but also because he hit and cursed at their mother "on numerous occasions." *Id.* at 599. Eventually, Mrs. Simcox grew tired of the abuse, made plans to leave Mexico with her four youngest children, packed up the family car, and drove them across the border to Texas on the way to her family in Ohio. The district court found that the children had been wrongfully removed from their habitual residence, but honored the decision of two of the children, ages 10 and 12, to remain with their mother. The court ordered the two younger children, ages four and eight, to be returned to the family residence in Mexico but—concerned for their safety—also ordered that they remain in their mother's custody and have no contact with their father until "the Mexican Court determines access and visitation rights." *Simcox I*, 499 F. Supp. 2d at 957.

On appeal, we found that Mrs. Simcox could not be forced to return to Mexico and that the risk of harm to the two younger children, if returned to their father, was grave. We then remanded the case to the district court to determine whether there were any conditions that would "be sufficient to ensure the safety of the Simcox children upon their return to Mexico pending the outcome of custody proceedings." *Simcox II*, 511 F.3d at 610. But we also warned that if "the only way in which the children may be protected from harm is for them to remain in the custody of their mother, then it may be necessary to deny the petition." *Id*. at 611. On remand, the district court declined to order the children returned to Mexico without their mother and denied the petition. *Simcox v. Simcox*, No. 1:07CV96, 2008 WL 2924094 (N.D. Ohio July 24, 2008) (*Simcox III*).

In the Neumanns' case, the district court should have done the same. Instead, the court minimized the severity of the risk that Julie and the children faced in Mexico, finding that it fell into "the middle-of-the-road" category of the tri-part analysis of *Simcox II*[9] and could not be considered "grave." *Neumann*, 187 F. Supp. 3d at 866. On appeal, whether there is a grave risk of harm under the Hague Convention is a mixed question of law and fact that is reviewed *de novo*. In my judgment, when viewed through this lens, the risk of harm to JSN and MKN if returned was at least as grave as that in *Simcox*, in which the primary risk to the children was the father's manner of discipline. But in that case, was there longstanding and severe, untreated alcoholism involved? No. Was there abuse of their mother that the children witnessed? Yes, but in *Simcox*, it did not result in injury requiring medical attention. Nor did it involve the children coming between the parents in an effort to wrest away a knife that their father was holding to their mother's throat. The gravity of the situation was such that Julie Neumann felt forced to flee the house immediately, to seek medical attention and for her own safety and that of her children.

---

[9] *Simcox II*, 511 F.3d 607–08.

She left Steve Neumann in a drunken stupor, from which he apparently did not awake until the following morning, when he found his family gone. There should have been no question about relief in this case.

As noted above, I would hold that this appeal became moot when Steven Neumann returned to Michigan. And although a brief remand may be necessary to confirm his current location, I cannot concur in the remainder of the majority opinion.